CASE NO. 23-5233

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

————————————

STEPHEN THALER,

*Plaintiff and Appellant,*

v.

SHIRA PERLMUTTER, Register of Copyrights and

Director of the United States Copyright Office, et al.,

*Defendant and Appellee.*

————————————

## APPELLANT'S OPENING BRIEF

————————————

On Appeal From Order of the United States District Court
for the District of Columbia

(Oral argument not yet scheduled)

Honorable Beryl A. Howell
Case No. 1:22-cv-01564-BAH

**BROWN NERI SMITH & KHAN LLP**
Ryan Abbott (SBN 281641)
*ryan@bnsklaw.com*
Timothy G. Lamoureux (SBN 294048)
*tim@bnsklaw.com*
11601 Wilshire Blvd., Suite 2080
Los Angeles, California 90025
Telephone:  (310) 593-9890
Facsimile:  (310) 593-9980
*Attorneys for Appellant Stephan Thaler*

i

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1) Counsel for the Plaintiff-Appellant STEPHEN THALER certifies the following:

## (a)    Parties and Amici

Stephen Thaler is the plaintiff in the district court and the appellant in this Court. Dr. Stephen Thaler is an individual, not a nongovernmental corporation or other entity. Therefore, no parent corporations or any publicly held companies own 10 percent or more of the stock of the party we represent.   No law firms, partners, or associates who are expected to appear have not already entered an appearance in this court. No appeal from the same trial court action was previously before this or any other appellate court or agency. STEPHEN THALER has no information identifying organizational victims in criminal cases and debtors and trustees in bankruptcy cases as required under Fed. R. App. P. 26.1(b) and 26.1(c).

Dr. Stephen Thaler is a computer scientist who invents and develops articifial intelligence systems.

The United States Copyright Office is the defendant in the district court and the appellee in this Court.

The Register of Copyrights and Director of the United States Copyright Office is included in her professional capacity as a defendant in the district court and appelle in this Court.

**(b)    Rulings Under Review.**

Plaintiff-appellant Stephen Thaler appeals the August 18, 2023 memorandum opinion (ECF No. 24) and order (ECF No. 23) of the United States District Court for the Columbia (Beryl A. Howell, J.) granting Defendant-Appellee's Copyright Office's motion for summary judgment and denying Stephen Thaler's motion for summary judgment. The opinion is not yet published in the federal reporter but is available at *Thaler v. Perlmutter*, CV 22-1564 (BAH), 2023 WL 5333236 (D.D.C. Aug. 18, 2023) and reproduced in the Appendix at APPX 185 - 199.

**(c)    Related Cases.**

There are no cases pending in any court or agency that will directly affect or be directly affected by the Federal Circuit's decision in this appeal.

Pursuant to Federal Circuit Rule 47.5, appellant states that to the best of his knowledge:

No appeal from the same trial court action was previously before this or any other appellate court or agency and there are no cases pending in any court or agency that will directly affect or be directly affected by the Federal Circuit's decision in this appeal.

## **ORAL ARGUMENT REQUESTED**

Pursuant to Federal Rule of Appellate Procedure section 34(a), the Appellant Stephen Thaler requests an oral argument on this matter. Appellant requests the oral argument because of the novel, complex, and important issues relating to copyright raised in this matter, and Appellant believes given these issues the Court will benefit from the opportunity to have the oral argument.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND

RELATEDCASES.................................................................ii

TABLE OF CONTENTS ..................................................... v

TABLE OF AUTHORITIES............................................viii

I.      INTRODUCTION...................................................1

II.     STATEMENT OF JURISDICTION.........................2

III.    STATEMENT OF ISSUES ......................................2

IV.     STATUTES AND REGULATIONS ........................2

V.      STATEMENT OF THE CASE .................................3

VI.     SUMMARY OF THE ARGUMENT ......................10

VII.    STANDING .........................................................11

VIII.   STANDARD OF REVIEW .....................................12

      A.      The Court of Appeals Reviews the District Court's Decision
          De Novo ..................................................................12

      B.      The Court of Appeals Does Not Give Any Deference to the
          Copyright Office's Decision ...................................14

      C.      Appropriate Legal Standard..................................19

IX.     ARGUMENT .......................................................21

A.   Dr. Thaler's Artwork Is Entitled to Copyright Protection ... 21

    1.  The Copyright Act's Plain Language Establishes That AI-Generated Works Are Entitled to Copyright Protection . 21

    2.  The Work is Sufficiently Original And Creative ............ 27

    3.  Should the Court Consider the Copyright Act Ambiguous, the Purpose of the Act Must be Considered and Requires Protection of AI-Generated Works ................................. 29

        a.  Courts Have Recognized that Technological Advancement Can Cause Ambiguity in the Copyright Act ................................................................................. 30

        b.  The Purpose of the Copyright Act Requires Protection of AI-Generated Works ................................................ 31

        c.  The Supreme Court, Applying the Purpose of Copyright, Has Repeatedly Expanded the Scope of Copyright, Showing an Expansive Principle Should Be Applied ...................................................................... 37

    4.  The Copyright Office Has No Support For Its View that Original Works of Authorship Require Natural Persons 38

B.    Dr. Thaler Is the Only Possible Owner of Copyright in the Work ....................................................................................... 42

1.  Dr. Thaler Is Right Holder Based on His Ownership of The Creativity Machine .................................................... 45

a. General Principles of Property Begetting Property Remaining with the Property Owner Provide the Copyright to Dr. Thaler ................................................ 46

b. Dr. Thaler Has the Right of First Possession to the Copyright .................................................................... 49

2.  Alternately, Dr. Thaler Is the Work's Author So No Property Transfer Is Necessary ....................................... 52

a. Dr. Thaler is the Owner As the Work Is a Work for Hire .............................................................................. 52

b. In the Alternate, Dr. Thaler is Directly the Work's Author ........................................................................ 56

X.    CONCLUSION ................................................................... 58

CERTIFICATE OF COMPLIANCE ............................................... 59

CERTIFICATE OF SERVICE ...................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Action Tapes, Inc. v. Mattson,*
  462 F.3d 1010 (8th Cir. 2006) ............................................................. 38

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ............................................................................. 42

*Alfred Bell & Co. v. Catalda Fine Arts,*
  191 F.2d 99 (2d Cir. 1951) .................................................................. 27

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
  934 F.3d 649 (D.C. Cir. 2019) ............................................................ 19

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .......................................................... 20

*Am. Forest Res. Council v. Hall,*
  533 F. Supp. 2d 84 (D.D.C. 2008) ...................................................... 14

*Ardmore Consulting Group, Inc. v. Contreras-Sweet,*
  118 F. Supp. 3d 388 (D.D.C. 2015) ............................................... 20, 53

*Bell Atl. Bus. Sys. Services, Inc. v. Hitachi Data Sys. Corp., C,*
  93-20079 JW, 1995 WL 836331 (N.D. Cal. Dec. 14, 1995) ................ 38

*Bleistein v. Donaldson Lithographing Co.,*
  188 U.S. 239 (1903) ............................................................................. 29

*Brown v. Legal Found. of Washington,*
  538 U.S. 216 (2003) ............................................................................. 48

*Burrow-Giles Lithographic Co. v. Sarony,*
  111 U.S. 53 (1884) .......................................................................... 6, 28

*Callaghan v. Myers,*
  128 U.S. 617 (1888) ............................................................................. 51

*Carruth v. Easterling,*
  247 Miss. 364 (1963) .................................................................. 47

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ..................................................................... 14

*City of Arlington, Tex. v. F.C.C.,*
  569 U.S. 290 (2013) ..................................................................... 15

*Cmty. for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989) ................................................................ 54, 55

*Coykendall v. Eaton,*
  1869 WL 5957 (N.Y. Gen. Term. 1869) ...................................... 50

*Eldred v. Ashcroft,*
  537 U.S. 186 (2003) ..................................................................... 32

*Exch. Comm'n v. Chenery Corp.,*
  332 U.S. 194 (1947) ..................................................................... 21

*Fantasy, Inc. v. Fogerty,*
  664 F. Supp. 1345 (N.D. Cal. 1987) ........................................... 45

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,*
  499 U.S. 340 (1991) ................................................................ 27, 33

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..................................................................... 24

*Fortnightly Corp. v. United Artists Television, Inc.,*
  392 U.S. 390 (1968) ..................................................................... 37

*Fox Film Corp. v. Doyal,*
  286 U.S. 123 (1932) ..................................................................... 32

*Fox Television Stations, Inc. v. FilmOn X LLC,*
  150 F. Supp. 3d 1 (D.D.C. 2015) ................................................ 15

*Fox v. Clinton,*
  684 F.3d 67 (D.C. Cir. 2012) ................................................ 16, 17

*Gerlach-Barklow Co. v. Morris & Bendien,*
    23 F.2d 159 (2d Cir. 1927)................................................................51

*Golan v. Holder,*
    565 U.S. 302 (2012) ......................................................................32

*Goldstein v. California,*
    412 U.S. 546, 561 (1973) ..........................................................37, 39

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ......................................................................16

*Google LLC v. Oracle Am., Inc.,*
    141 S. Ct. 1183 (2021) ..................................................................30

*Griffin v. Sheeran,*
    351 F. Supp. 3d 492 (S.D.N.Y. 2019) ...........................................45

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539 (1985) ......................................................................33

*Holland v. Nat'l Mining Ass'n,*
    309 F.3d 808 (D.C. Cir. 2002) ......................................................12

*Horror Inc. v. Miller,*
    15 F.4th 232 (2d Cir. 2021) .....................................................53, 54

*Houghton Mifflin Co. v. Stackpole Sons,*
    Inc., 104 F.2d 306 (2d Cir. 1939) .............................................46, 51

*In re C Tek Software, Inc.,*
    127 B.R. 501 (Bankr. D.N.H. 1991) ..............................................49

*In re Trade-Mark Cases,*
    100 U.S. 82 (1879) ...........................................................5, 6, 7, 28

*Jicarilla Apache Nation v. U.S. Dept. of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ....................................................12

*Kelley v. Chicago Park Dist.,*
    635 F.3d 290 (7th Cir. 2011) .........................................................41

*King v. Burwell*,
  576 U.S. 473 (2015) ............................................................ 16

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ......................................... 20

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013) ............................................... 25

*Mazer v. Stein*,
  347 U.S. 201 (1954) .................................................... 34, 39

*Mohamad v. Palestinian Auth.*,
  566 U.S. 449 (2012) ........................................................... 23

*Occidental Eng'g Co. v. I.N.S.*,
  753 F.2d 766 (9th Cir. 1985) ............................................. 14

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,
  684 F.2d 821 (11th Cir. 1982) ........................................... 27

*Phillips v. Washington Legal Found.*,
  524 U.S. 156 (1998) ........................................................... 48

*PhotoCure ASA v. Kappos*,
  603 F.3d 1372 (Fed. Cir. 2010) ......................................... 19

*Pierson v. Post*,
  1805 WL 781 (N.Y. Sup. Ct. 1805) .................................... 51

*Pub. Employees Ret. Sys. of Ohio v. Betts*,
  492 U.S. 158 (1989) ........................................................... 14

*Roulo v. Russ Berrie & Co., Inc.*,
  886 F.2d 931 (7th Cir. 1989) ............................................. 28

*S. California Edison Co. v. FERC*,
  195 F.3d 17 (D.C. Cir. 1999) ....................................... 22, 24

*Seeger v. United States Dep't of*,
  Def., 306 F. Supp. 3d 265 (D.D.C. 2018) ........................ 2, 12

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ................................................................. 16

*Smith v. City of Jackson, Miss.*,
  544 U.S. 228 (2005) ................................................................. 14

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................. 30

*State of Nebraska v. State of Iowa*,
  143 U.S. 359 (1892) ................................................................. 48

*Thaler v. Perlmutter, CV 22-1564 (BAH)*,
  2023 WL 5333236 (D.D.C. Aug. 18, 2023) ............................. iii

*Twentieth Century Music Corp.*,
  422 U.S. ................................................................................... 33

*U.S. Home Corp. v. R.A. Kot Homes, Inc.*,
  563 F. Supp. 2d 971 (D. Minn. 2008) .................................... 46

*Urantia Found. v. Kristen Maaherra*,
  114 F.3d .................................................................................. 40

*W. Virginia v. Envtl. Prot. Agency*,
  597 U.S. 697 (2022) ................................................................. 16

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ............................................... 25

*Washingtonian Pub. Co. v. Pearson*,
  306 U.S. 30 (1939) ................................................................... 32

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980) ................................................................. 48

*Wihtol v. Wells*,
  231 F.2d 550 (7th Cir. 1956) ................................................. 27

## **Statutes**

17 U.S.C. § 101 .......................................................................... 23, 56

17 U.S.C. § 102(a) ................................................................. 6, 21, 22

17 U.S.C. § 102(b) ..................................................................... 22

17 U.S.C. § 201 ......................................................................... 52

17 U.S.C. § 201(b) ..................................................................... 25

17 U.S.C. § 203 ......................................................................... 25

17 U.S.C. § 204(a) ..................................................................... 45

17 U.S.C. § 301(a) ..................................................................... 22

17 U.S.C. § 302(c) ................................................................ 24, 25

28 U.S.C. § 1291 ......................................................................... 2

28 U.S.C. § 1331 .................................................................... 2, 11

5 U.S.C. § 702 ........................................................................... 12

5 U.S.C. § 706 ........................................................................... 19

5 U.S.C. § 706(2) ....................................................................... 21

5 U.S.C. § 706(2)(A)-(D) ........................................................ 13, 14

## Other Authorities

Epstein, *Possession as the Root of Title,* 13 Georgia Law Review 1221
    (1979) ................................................................................. 50

Ginsburg, *A Tale of Two Copyrights: Literary Prop. in Revolutionary
    France & Am.,*A Tale of Two Copyrights: Literary Prop. in
    Revolutionary France & Am., 64 Tul. L. Rev. 991 (1990) ................... 34

H.R. REP. No. 2222 ..................................................................... 35

H.R. REP. No. 94-1476, at 51 ................................................. 7, 36, 38

Marinotti, *Possessing Intangibles*, 116 Nw. U.L. Rev. 1227 (2022) . 49, 50

Merrill, *Accession & Original Ownership*,Accession & Original
  Ownership, 1 J. Legal Analysis 459 (2009) ........................................47

Miller, C*opyright Protection for Computer Programs, Databases, and
  ComputerGenerated Works: Is Anything New Since Contu?*, 106 Harv.
  L. Rev. 977, 1069-70 (1993)................................................. 17, 18, 30, 31

Sterk, *Rhetoric & Reality in Copyright Law*,Rhetoric & Reality in
  Copyright Law, 94 Mich. L. Rev. 1197 (1996) .....................................33

Tehranian, *Copyright's Male Gaze: Authorship & Inequality in A
  Panoptic World*,Copyright's Male Gaze: Authorship & Inequality in A
  Panoptic World, 41 Harv. J.L. & Gender 343 (2018) ..........................57

# I.    <u>INTRODUCTION</u>

This case presents a relatively straightforward question: is a creative work generated by an artificial intelligence system in the absence of a direct contribution by a traditional human author copyrightable. The Copyright Office refused to register a copyright in an artwork created by Dr. Stephen Thaler's AI system, despite him being its creator and user.

Nothing in the Copyright Act requires human creation. Instead, it explicitly allows  for non-human authors. Corporations have been authors for over a hundred years. Despite this, the Copyright Office relies on dicta from a bevy of cases that pre-date the possibility of artificial intelligence having the capability to create copyrightable works.

The Copyright Office justifies this, in part, with an appeal to the purpose of copyright, to protect authors, but that is not the purpose of copyright. It has been a common refrain in the Supreme Court that helping authors is a mere means to an end, which is to provide copyrighted works to the public. Nothing would greater incentivize the

growth of creative works available and benefit the public than ensuring copyright law protects works made using AI systems.

## II.    **STATEMENT OF JURISDICTION**

The District Court had proper jurisdiction over the instant action under 28 U.S.C. § 1331 to review an agency action pursuant to the APA. *Seeger v. United States Dep't of Def.*, 306 F. Supp. 3d 265, 276 (D.D.C. 2018).

The jurisdiction of this Court is based on 28 U.S.C. § 1291. This appeal is from a final order or judgment that disposes of all parties' claims, which the district court entered on August 18, 2023. Plaintiffs-appellants' timely notice of appeal was filed on October 11, 2023, within sixty days of the district court's memorandum opinion and order.

## III.    **STATEMENT OF ISSUES**

1. Whether the district court erred by granting the Copyright Office's summary judgment motion and denying Stephen Thaler's summary judgment motion based on its determination that works created by an AI system are not copyrightable.

## IV.    **STATUTES AND REGULATIONS**

2

All applicable statutory and regulatory provisions are reproduced in the Addendum to this brief.

## V.    STATEMENT OF THE CASE

Plaintiff-Appellant ("Dr. Thaler") appeals from: (1) the Judgment entered on August 18, 2023 (APPX 184) and (2) the Memorandum Opinion dated August 18, 2023 (APPX 185) denying Dr. Thaler's motion for summary judgment and granting the U.S. Copyright Office's motion for summary judgment. (APPX 185).

Plaintiff Dr. Stephen Thaler develops, owns, and applies AI systems capable of generating creative output including visual art in the absence of a direct contribution from a traditional human author ("AI-Generated Works"). (APPX 023, ¶ 14.) The specific visual art at issue here would undoubtedly qualify for copyright protection had it been made directly and solely by Dr. Thaler without any computer assistance. (APPX 023, ¶ 14.)

Plaintiff's AI system produced a two-dimensional artwork (the "Work") titled "A Recent Entrance to Paradise," reproduced below:



AR0031.

On November 3, 2018, Dr. Thaler filed an application (#1-7100387071) to register the work with the United States Copyright Office. APPX 042.

In the application, Dr. Thaler identified the author of the Work as the "Creativity Machine," *Id*. At APPX 043. Dr. Thaler also listed himself as the "Copyright Claimant." *Id*.  He also included a transfer statement labelled "Ownership of the Machine." *Id*.

Plaintiff separately noted in the application that the Work was autonomously created by a computer and that he was entitled to own the copyright in the Work including by virtue of the work made for hire doctrine. *Id*.

On August 12, 2019, the Copyright Office refused to register the copyright. The Copyright Office wrote, "We cannot register this work because it lacks the human authorship necessary to support a copyright claim. According to your application this work was 'created autonomously by machine.'" APPX 045.[1] However, Dr. Thaler's entitlement to any copyright in the work remained unaddressed. *See id*.

Thus, Dr. Thaler filed a request for reconsideration to the Copyright Office on September 23, 2019. APPX 049. Appellant argued that the Copyright Office lacked the legal basis to deny copyright in an AI-Generated Work. *Id*.

The Copyright Office denied the request for reconsideration, based on its prior determination that copyright only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind," relying on *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879). APPX 059. The Copyright Office argued that since copyright law is limited to "original intellectual conceptions of the author," it refused to register the claim because it determined a human being did not create the Work.

---

[1] The Copyright's Office view that there is a "Human Authorship Requirement" is located in the Compendium of U.S. Copyright Office Practices ("Compendium") § 306.

*Id.* The Copyright Office again cited to *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884), 17 U.S.C. § 102(a), and the Compendium of U.S. Copyright Office Practices § 306 (3ded. 2017). Id.

Dr. Thaler filed a second request for reconsideration with the Copyright Office on May 27, 2020. APPX 063. The Copyright Office denied this request on February 14, 2022. APPX 071. The Copyright Office accepted that the Work was "autonomously created by artificial intelligence without any creative contribution from a human actor." APPX 072. Citing again to *In re Trade-Mark Cases*, 100 U.S. 82, the Copyright Office stated that Plaintiff had failed to either provide evidence that the Work is the product of human authorship or convince the Copyright Office to "depart from a century of copyright jurisprudence." APPX 073. Since there was no issue of human author involvement, the Copyright Office limited its review to whether the human authorship requirement was unconstitutional and unsupported by case law. *See* APPX 071-077.

The Copyright Office argued that the phrase "original work of authorship" was "purposefully left undefined" by Congress in order to "incorporate without change the standard of originality established by

6

the courts under the [1909] copyright statute[,]" citing to H.R. Rep. No. 94-1476, at 51 (1976). APPX 073-074. The Copyright Office further stated that the Copyright Act leaves "unquestionably other areas of existing subject matter that [Bill 94-1476 did] not propose to protect but that future Congresses may want to." *Id*.

The Copyright Office cited *Burrow-Giles Lithographic Co.*, once more, claiming that it stood for the proposition that copyright was afforded to photography because photographs are "representatives of original intellectual conceptions of [an] author," observing that the court referred to "authors" as human. APPX 074. The Copyright Office also pointed to *Mazer v. Stein*, arguing that the Supreme Court defined an author as someone who "may be viewed as an individual who writes an original composition." APPX 074.

Despite its various arguments, the Copyright Office also admitted that it did not know if a court ever considered the authorship of a copyright by artificial intelligence but argued that the decisions rejecting registration for non-human spiritual beings and animals supported its position. APPX 073.

The Copyright Office also relied on the National Commission on New Technological Uses of Copyrighted Works ("CONTU") as support of its position, despite CONTU's explicit refusal to address the copyrightability of AI-Generated Works given that CONTU considered such works technologically impossible at the time. In its final report in 1979, CONTU determined that the existing judicial construction requiring human authorship sufficiently enabled protection for works created with the use of computers, and that no amendment to copyright law was then needed. APPX 075. CONTU specifically stated that eligibility of registration did not depend on the use of devices in its creation, but rather if there was the presence of at least minimal human creative effort at the time it was produced. APPX 075.

Finally, the Copyright Office cited to "a recent report from the U.S. Patent and Trademark Office ("USPTO") addressing intellectual property issues raised by AI." In its summary of responses, USPTO stated that "the vast majority of commenters acknowledged that existing law does not permit a non-human to be an author [and] this should remain the law." APPX 076.

After the Copyright Office made it clear that its decision was final,
Thaler commenced an action for review of the agency action in the
District Court for the District of Columbia, filing a complaint on June 2,
2022. (Docket No. 1; APPX 001). On June 3, 2022, Thaler filed a
corrected complaint. (Docket No. 2-1; APPX 020). On January 10, 2023,
Dr. Thaler filed a motion for summary judgment. (Docket No. 16; APPX
078) On February 7, 2023 the Copyright Office filed its opposition and
cross-motion for summary judgment. (Docket No. 17; APPX 116).
Afterward, Dr. Thaler filed a reply in opposition on March 7, 2023, and
the Copyright Office filed its reply on April 5, 2023. (Docket Nos. 18 and
21; APPX 150 and APPX 169)

Though Thaler requested an oral argument, the district court
decided that it was unnecessary and issued an order and memorandum
of opinion on August 18, 2023 denying Thaler's motion for summary
judgment and granting Copyright Office's motion for summary
judgment. The Court based its decision on its framing of the question at
issue: "the single legal question presented here is whether a work
generated autonomously by a computer falls under the protection of
copyright law upon its creation." APPX 190. The Court concluded that,

"United States copyright law protects only works of human creation."

APPX 191. Following this determination, Thaler timely filed a notice of appeal.

## VI.    SUMMARY OF THE ARGUMENT

The Copyright Act (the "Act") entitles Dr. Thaler to a copyright in his AI-Generated Work. No language in the Act creates a Human Authorship Requirement. To the contrary, non-human authorship has been a fixture of American copyright law for more than a century and there is no requirement to identify any creative contribution by a natural person. There is also no case that stands for the proposition that the Act contains an implicit Human Authorship Requirement. Once more to the contrary, the Supreme Court has repeatedly held that the Act is intended to be interpreted expansively and dynamically to capture the benefits of technological progress.

Protecting AI-Generated Works is entirely consistent with the Act's purpose. Both Congress and the Supreme Court have been clear that copyright exists to benefit the American public by incentivizing the creation and dissemination of creative works, not to directly benefit authors. Benefit to an author is merely a means to an end to ensure the

dissemination and creation of creative works. Allowing copyright in AI-Generated Works accomplishes the same goal because it encourages individuals and companies to develop and use AI systems to create and disseminate valuable creative works, while denying copyright protection would frustrate the Act's purpose.

This Court should hold that Dr. Thaler's Work is entitled to protection. Either the AI system, the proximate originator of the Work, should be listed as the author with Dr. Thaler as the copyright owner by virtue of well-established property rules, or Dr. Thaler should be listed as the author either under the work for hire doctrine or because he ultimately exercised control over the Work's creation.

Thus, this Court should reverse the District Court's errant interpretations and accordingly vacate the summary judgment award and instead grant summary judgment in favor of Dr. Thaler and allow him to receive his copyright.

## VII.   STANDING

Plaintiff Stephen Thaler was denied registration in a copyright in his application to the Copyright Office, and he therefore has standing for this this Court to review pursuant to the APA according to 28 U.S.C.

§ 1331; *Seeger v. United States Dep't of Def.*, 306 F. Supp. 3d 265, 276 (D.D.C. 2018). He has suffered a cognizable injury, namely, denial of a property right in the Work. The Court can redress the harm to Plaintiff Stephen Thaler by reversing the agency's action, and ordering the Copyright Office to register Dr. Thaler's copyright in the Work.

## VIII.    STANDARD OF REVIEW

### A.    The Court of Appeals Reviews the District Court's Decision De Novo

In APA actions, this Court reviews a grant of summary judgment by a district court *de novo* applying the same standard as the district court. *See e.g., Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010); *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (The court will "review the administrative action directly, according no particular deference to the judgment of the District Court."

The APA grants anyone "suffering a legal wrong because of agency action" the right of judicial review (5 U.S.C. § 702), with the reviewing court applying the legal standard enunciated in Section 706 of the APA:

> [T]he reviewing court *shall decide all relevant questions of law, interpret constitutional and*

12

*statutory provisions, and determine the meaning or applicability of the terms of an agency action.* The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions

founds to be –

(A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law
(B)    contrary to constitutional right, power, privilege or immunity;
(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D)    without observance of procedure required by law:

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party….

5 U.S.C. § 706(2)(A)-(D).

In other words, the reviewing court has the duty to make an independent assessment as to whether an agency's regulations are in excess of statutory jurisdiction or otherwise contrary to law.

The APA further "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency." *Id.* (citations omitted). "As such, there can be no genuine issue of material fact in an APA action, and the legal questions presented in [an APA] action are therefore ripe for resolution on cross-

13

motions for summary judgment." *Id.* (citing *Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 89 (D.D.C. 2008) (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985)).

## B.    The Court of Appeals Does Not Give Any Deference to the Copyright Office's Decision

The Supreme Court has placed limits on when courts must defer to federal agencies when construing statutes. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984). If the underlying statute is unambiguous, agency interpretations receive no deference. *Id.* This case only involves the Copyright Office's interpretation of unambiguous provisions of the Act, and the Copyright Office is therefore not entited to any deference.

Deference is also foreclosed by agency interpretations that defy the statute's plain text. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 266 (2005) ("[I]t is elementary that 'no deference is due to agency interpretations at odds with the plain language of the statute itself.'") (Quoting *Pub. Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989).) As discussed below, the plain language of the Act contains no Human Authorship Requirement, and in fact, explicitly allows non-

14

human authorship, so reading requirements that do not exist into a statute attempts to create ambiguity where none exists.

Even if this Court were to find that the relevant provisions of the Act are ambiguous, the Copyright Office's interpretation would still not be entitled to Chevron deference because, as discussed below, the Copyright Office's interpretation does not fall "within the bounds of reasonable interpretation." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013).

Also, the Copyright Office is given no deference under *Chevron* for decisions that are not based on its own formal rulemaking and regulatory authority. *See Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 25 (D.D.C. 2015) ("The Court will not apply Chevron deference in the absence of formal rulemaking….")  Just like in *FilmOn X LLC*, the "Copyright Office's position . . . is not based on a formal regulation" and therefore not entitled to *Chevron* deference. *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 25 (D.D.C. 2015).

Finally, in certain cases involving interpretive questions of key significance, Congress should not be presumed to have intended for the

agency to resolve those questions. *See King v. Burwell*, 576 U.S. 473, 485–486 (2015). The agency must instead identify "clear congressional authorization". *W. Virginia v. Envtl. Prot. Agency*, 597 U.S. 697 (2022). This is such a case because whether the Act contains a Human Authorship requirement has vast economic and political significance, and will have increasing significance given ongoing advances in AI system capabilities. There is no evidence Congress intended to delegate interpretation of the relevant provisions of the Act to the Copyright Office, which does not have any special expertise in this matter, including that of a scientific or technical matter. This case involves straightforward questions of statutory interpretation in matters of common knowledge, for which Courts are best equipped and empowered to exercise interpretive functions.

Defendants are also not entitled to *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), The Copyright Office "is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Gonzales v. Oregon, 546 U.S. 243, 256 (2006).*) Without "reasoned decisionmaking" the Copyright Office's ultimate decision is not entitled to deference. *See*

16

*id.* at 77. The Copyright Office first finds ambiguity where none exists, and then relies on dicta from cases that are largely unrelated to AI-Generated Works to argue that a direct, identifiable human contribution is necessary for copyright to exist. Inapplicable Gilded Age dicta cannot form the the basis of reasoned decisionmaking on AI-Generated Works.

The Copyright Office also misstates and misconstrues its own references. For instance, if anything relevant to the present case, *Burrow-Giles* stands for the proposition that terms in the copyright context should not be interpreted hypertextually, but rather purposively in light of evolving technology. *Burrow-Giles* was a case in which the Supreme Court held that a photograph was eligible for copyright protection, even though it was not, literally, the writing of an author. Rather than adopt a hypertextualist approach, the Supreme Court held that a photograph was the sort of thing that copyright was intended to protect given technological advances.

Similarly, the Copyright Office cites to the CONTU report in support of not protecting AI-Generated Works. But that is at odds with CONTU's actual findings. Arthur R. Miller, Copyright Protection for Computer Programs, Databases, and ComputerGenerated Works: Is

17

Anything New Since Contu?, 106 Harv. L. Rev. 977, 1069-70 (1993). Arthur Miller, one of the CONTU commissioners, expressed confidence in the Harvard Law Review that, "[i]f the day arrives when a computer really is the sole author of an original artistic, musical, or literary work (whether novel or computer program), copyright law will be embracive and malleable enough to assimilate that development into the world of protected works." *Id*. at 1073. Professor Miller further opined:

> Our discomfort with the notion of computer-"authored" works (even if we cannot articulate a principled reason for the discomfort) is in keeping with a recurring phenomenon in the development of copyright law. In every age, a new technology has appeared about which people have expressed fear and concern, claiming that it defies the boundaries of the existing legal system. With respect to copyright, these claims were made about photographs, motion pictures, sound recordings, radio, television, and other telecommunications. In each case, the copyright system has managed over time to incorporate the new medium of expression into the existing framework. Most recent of the upstart new technology has been assumed by computers. For a while the computers-and-copyright battlefield was centered on the copyrightability of computer programs as literary works. That contest now has been largely fought and resolved in favor of copyrightability. It may be that the next battle will be over copyrightability of computer-generated works. Arthur Miller,

Computers and Authorship: The Copyrightability of Computer-Generated Works, WIPO WORLDWIDE SYMPOSIUM ON THE INTELLECTUAL PROPERTY ASPECTS OF ARTIFICIAL INTELLIGENCE (1991), https://www.wipo.int/edocs/pubdocs/en/wipo_pub_698.pdf. at 245-246.

Regardless, "[e]ven if some level of deference were owed to the [agency's] interpretation. . . neither Chevron nor Skidmore permits a court to defer to an incorrect agency interpretation." *PhotoCure ASA v. Kappos*, 603 F.3d 1372, 1376 (Fed. Cir. 2010). Here, the Copyright Office's reasoning is not only unpersuasive—it is manifestly contrary to the text of the Act and the purpose of the copyright system.

## C. Appropriate Legal Standard

Under the APA, "the statute provides that [the Federal Courts] 'decide all relevant questions of law' and "interpret ... statutory provisions.' We ordinarily set aside agency actions that are either 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019) (quoting 5 U.S.C. § 706.).

"[W]hen, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply. Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ardmore Consulting Group, Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015) (internal quotation marks and citations omitted).

As this Court makes clear, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal . . . [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).)

Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity;

[or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . ." 5 U.S.C. § 706(2). The court must judge the propriety of the agency's action based "solely [on] the grounds invoked by the agency" when it made the challenged decision. *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

## IX.    <u>ARGUMENT</u>

### A.    **Dr. Thaler's Artwork Is Entitled to Copyright Protection**

1.    <u>The Copyright Act's Plain Language Establishes That AI-Generated Works Are Entitled to Copyright Protection</u>

It is undisputed that the Work constitutes a fixed, visual artwork that, if created solely by a natural person without computer assistance, would be protected by copyright. The Copyright Office's only basis for refusing to register the Work is its position that copyright is limited to the "creations of human authors."[2] AR0034. The Copyright Office does

---

[2] To the extent that there is any question as to the level of creativity a machine is capable of, the procedural posture of the case is that the Creativity Machine did make an "original work," and it is not a mere copy of another work. 17 U.S.C. § 102(a).

not, in its rejection, provide more specifics as to what copyright requirement, specifically, is not met by an AI-Generated Work, i.e., authorship or originality. It does not matter, ultimately, because the Work satisfies the requirements set forth in the Copyright Act, as it constitutes an "original work[] of authorship."  17 U.S.C. § 102(a); 17 U.S.C. § 301(a).

"The starting point, and the most traditional tool of statutory construction, is to read the text itself," *S. California Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999). "An original work of authorship" contains no reference to a natural person, though it would have been very easy for Congress to include such a limitation. For instance, 17 U.S.C. § 102(b) contains explicit prohibitions on what cannot be copyrighted: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." It says nothing about limiting protection for works created by non-human entities. As such, the common sense reading of "an original work of authorship" is one without restrictions on the

22

identity of the author. The most straightforward interpretation of the term "author", which is not defined in the act, is thus simply that the the factual author—the entity that actually originated the work—is the author for purposes of the Act.

Dictionary definitions lend further support to this conclusion. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456–57 (2012). The dictionary defines an author as, "one that originates or creates something." *Author*, Merriam-Webster Dictionary (2023). Looking at the definition for the subject that is the author, "one," it is a "a single person or *thing*," which explicitly allows for non-human things, as opposed to solely a natural person. *One*, Merriam-Webster Dictionary (2023) (Emphasis added.) The AI system in this case is the proximal originator of the Work as an undisputed factual matter. Therefore, it is also the author as a legal matter based on the ordinary meaning of the term "author" in the Act. What the Act's language indicates is that when an entity—a natural person, a corporation, a machine—generates a creative work, that entity is the author.[3]

---

[3] Additionally, 17 U.S.C. § 101 includes a definition for an "anonymous work" that contemplates a "work . . . of which no natural person is

The language and design of the statute as a whole additionally reinforce this interpretation, and "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 (2000); *Southern California Edison Co.*, 195 F.3d at 23. In particular, the Act has detailed provisions for non-human authorship of Works including works lacking any direct or identifiable contribution by a natural person.  The Copyright Office's claim that authorship is human-centric or that protection of a work requires a particular contribution by a natural person is thus directly at odds with the Act's language and well-settled law.

For instance, corporations, governments, and similar non-human entities can qualify as authors under the Act. *Act of March 4, 1909, ch. 320*, 35 Stat. 1075. *Id.* The Copyright Act also has a clear scheme for works created by authors with no natural lifespan. 17 U.S.C. § 302(c) provides that copyrights created by anonymous or pseudonymous

---

identified as author," and the Act has a full framework of how to treat such works.

authors last a set duration regardless of the date of death of the author. *Id.* Additionally, works made for hire have durations divorced from any human lifespan. *Id.* The work for hire provision states, "the employer or other person for whom the work was prepared is considered the author for purposes of this title" in the case of a work for hire. 17 U.S.C. § 201(b). Even though it uses the phrase "other person," person here is used in its broadest sense to include non-human entities. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140–41 (9th Cir. 2003). Numerous non-humans have been declared authors by the courts without controversy. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013); *Warren*, 328 F.3d at 1140–41.

The Act also treats human and non-human authors differently in other ways. For instance, termination rights do not vest in "works for hire," so individual human creators already have rights and protections under the Act. 17 U.S.C. § 203. Nothing in the Act's language limits authorship to natural persons, and the weight of the Act does the opposite, as it treats human and non-human authors differently depending on context. Absent an explicit statutory limitation, it is not the role of this Court to deny protection for an AI-Generated Work as

25

long as the basic elements of copyright protection are met. If Congress elects to limit protection for AI-Generated Works it is Congress' prerogative to amend the Act to do so.

To be clear, in cases in which, for example, a company registers copyright as an author, there is no requirement that any natural person be disclosed, and there is no requirement for any disclosure about how the work was created. The Copyright Office's own registration procedures allow for non-human authors and for no natural person to ever be identified: "Author(s). After reading these instructions, decide who are the 'authors' of this work for copyright purposes… If you have checked 'Yes' to indicate that the work was 'made for hire,' you must give the full legal name of the employer (or other person for whom the work was prepared). You **may** also include the name of the employee along with the name of the employer (for example: 'Elster Publishing Co., employer for hire of John Ferguson')… For any part of this work that was 'made for hire,' check 'Yes' in the space provided, give the employer (or other person for whom the work was prepared) as 'Author' of that part, and leave the space for dates of birth and death blank." https://www.copyright.gov/forms/formva.pdf (emphasis added), last

accessed February 25, 2023. It is entirely likely that the Copyright Office has already registered numerous AI-Generated Works given that the Copyright Office has not historically had any AI-related disclosures on its registration form and it has no meaningful way of detecting the use of AI in the creation of a work.

### 2. The Work is Sufficiently Original And Creative

The bar for originality and creativity is low, and an AI-Greated Work can easily qualify. "To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991) (citation omitted). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 345 (citation omitted); *e.g. Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99 (2d Cir. 1951) (Originality is "little more than a prohibition of actual copying. No matter how poor the 'author's' addition, it is enough if it be his own.'" (Quoting *Wihtol v. Wells*, 231 F.2d 550 (7th Cir. 1956)); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821 (11th Cir. 1982).

The Work at issue meets this low standard, because the Work "owes its origin" to the Creativity Machine (and ultimately Dr. Thaler), and was a "product of the independent efforts of the author," which is the small hurdle required to reach copyrightability. *See* David Nimmer, *Nimmer on Copyright*, § 2.01(A)(1). The Work contains visual elements arranged in a novel way, which merits protection. *See e.g. Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 939 (7th Cir. 1989) ("just as individual words do not deserve copyright protection, it is the unique combination of these common elements which form the copyrighted material.").

The Copyright Office cannot find a statutory prohibition on AI-Generated Works, so it relies on dicta it misleadingly refers to as "a century of copyright jurisprudence." APPX 073. But, in fact, the only thing Copyright Office has to support its position is irrelevant dicta. APPX 073. So much so that the cases that Copyright Office cites in support of its Human Authorship Requirement in its Compendium— *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884) and *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879)—are from the 19th century and greatly predate even the invention of the first modern computers.

But these cases even support Dr. Thaler's entitlement to register a copyright in his work. *Burrows-Giles* stands for the principle that the Act should be read expansively to accommodate and embrace technological advancement. Photographic technology mirrors, in many ways, the development and use of AI. Both can be thought of as creative tools, the use of which can result in the generation of new creative works with resultant public benefits.

This application also follows the principle that a work should have "copyright unless there is a restriction in the words of the act." *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903). The Copyright Office's determination that AI-Generated Works should not be protected, and that only a very particular type of human-centric creativity is worthy of protection (although the Copyright Office is quite fuzzy on exactly what a person has to do versus a machine), is precisely the type of aesthetic judgment that the Bleistein Court expressly cautioned against jurists making.

    3.    <u>Should the Court Consider the Copyright Act Ambiguous, the Purpose of the Act Must be Considered and Requires Protection of AI-Generated Works</u>

a.   Courts Have Recognized that Technological Advancement Can Cause Ambiguity in the Copyright Act

The Supreme Court has repeatedly instructed courts to flexibly read the Act to accommodate technological growth. "We have understood the provision to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984).)

At the time of the Act's adoption in 1976, AI-Generated Works were not yet a reality. In its denial, the Copyright Office relied in part on the 1979 CONTU report, but CONTU did not seriously consider the possibility of AI-Generated Works as they were considered "too speculative" at the time. Arthur R. Miller, *Copyright Prot. for Computer Programs, Databases, & Computer-Generated Works: Is Anything New Since Contu?*, 106 Harv. L. Rev. 977, 1066 (1993). Now, as a factual matter, it is undisputed that AI routinely generates output functionally equivalent to that created directly by a human mind.

30

In fact, in the relatively short time period since Dr. Thaler submitted his Work for registration and the present appeal, AI systems with human-like creative capabilities have become so widespread and easily accessible that several Courts have started requiring counsel to disclose whether submissions have been drafted in whole or part by generative AI systems. *See, e.g.,* https://www.ca5.uscourts.gov/docs/default-source/default-document-library/public-comment-local-rule-32-3-and-form-6.

> b.    The Purpose of the Copyright Act Requires Protection of AI-Generated Works

The purpose of the Copyright Act arises out of the Constitutional mandate "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id.* The Copyright Clause has been interpreted by the Supreme Court to provide an explicit rationale for granting copyright protection—namely to encourage the creation and dissemination of works for the public benefit rather than for the purpose of benefiting authors.

Copyright is "intended definitely to grant valuable, enforceable rights to authors, publishers, etc., without burden-some requirements; 'to afford greater encouragement to the production of literary [or artistic] works of lasting benefit to the world.'" *Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30, 36 (1939). The Act is also intended to promote dissemination of those works. *See*, *e.g.*, *Golan v. Holder*, 565 U.S. 302 (2012).

Protecting human authors is *not* the purpose of the Act.

> "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. In *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932), Chief Justice Hughes spoke as follows respecting the copyright monopoly granted by Congress, 'The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.' It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius." 334 U.S., at 158, 68 S.Ct. 915.

*Eldred v. Ashcroft*, 537 U.S. 186, 227 (2003)

32

The Supreme Court has reiterated this principle numerous times, often correcting the mistaken belief that the rewards for authors are the end sought rather than simply a means to an end for society to have more creative works. "The immediate effect of our copyright law is to secure a fair return for an author's creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp.,* 422 U.S. at 156; *see also United States v. Paramount Pictures*, 334 U.S. 131, 158 (1948) ("It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius."); Stewart E. Sterk, "*Rhetoric & Reality in Copyright Law*, 94 Mich. L. Rev. 1197, 1203 (1996) ("[I]t is incentive language that pervades the Supreme Court's copyright jurisprudence."). "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349 (1991) (alteration in original); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985) ("It is evident that the monopoly granted by copyright actively served its intended purpose of inducing the creation of new material of potential

33

historical value. In a case relied on by the Copyright Office, *Mazer v. Stein*, 347 U.S. 201 (1954), the Court also explained that "the economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful arts.'" *Mazer*, 347 U.S. at 219.

Congress has been equally consistent in finding that the purpose of Copyright is to promote the generation and dissemination of works. Congress passed its first Copyright Act in 1790, which inherited numerous provisions from the Statute of Anne. The Act stated it was "for the encouragement of learning, by securing copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned." Authors and proprietors are mentioned, but the public remained the law's primary beneficiaries. Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Prop. in Revolutionary France & Am.*, 64 Tul. L. Rev. 991, 1015 (1990). ("Congress adopted a rather pragmatic view of the kinds of works that achieved that objective: the first copyright law protected maps, charts, and books-in that order. The

34

great majority of works for which authors or publishers sought

copyright protection under that first statute were highly useful

productions.").

The legislative history of the more recent copyright acts shows

this is still the purpose Congress hoped to achieve. The House of

Representatives committee most responsible for the 1909 Copyright Act

noted the following:

> The enactment of copyright legislation by
> Congress under the terms of the Constitution is
> not based upon any natural right that the author
> has in his writings, for the Supreme Court has
> held that such rights as he has are purely
> statutory rights, but upon the ground that the
> welfare of the public will be served and progress
> of science and useful arts will promoted by
> securing to authors for limited periods the
> exclusive rights to their writings. The
> Constitution does not establish copyrights, but
> provides that Congress shall have the power to
> grant such rights if it thinks best. Not primarily
> for the benefit of the author, but primarily for
> the benefit of the public, such rights are given.
> Not that any particular class of citizens, however
> worthy, may benefit, but because the policy is
> believed to be for the benefit of the great body of
> people, in that it will stimulate writing and
> invention, to give some bonus to authors and
> inventors.

H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909) at 5.

35

The House of Representatives made a similar note when preparing and finalizing the current iteration of the Copyright Act:

> The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms-- electronic music, filmstrips, and computer programs, for example-- could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation. In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

*See* H.R. REP. 94-1476, 51, 1976 U.S.C.C.A.N. 5659, 5664.

If AI-Generated Works are ineligible for copyright protection, this would eliminate critical financial incentives to create and disseminate such works because anyone could freely use them without license. In turn, this would discourage investment and labor in a critically new and important developing field, and it would also discourage investment and labor in AI development that will result in social benefits even outside of the creative industry. *See* Gary Meyers, The Future Is Now:

Copyright Protection for Works Created by Artificial Intelligence, Texas Law Review Online, Vol 102 (2023).

> c.    The Supreme Court, Applying the Purpose of Copyright, Has Repeatedly Expanded the Scope of Copyright, Showing an Expansive Principle Should Be Applied

The bottom line is that "our inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here." *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 395 (1968). Thus, "[w]e must read the statutory language of 60 years ago in the light of drastic technological change." *Id.* In the past, this has meant that the Supreme Court applied this principle to determine that radio plays of music constituted a "performance" of copyrighted work. *Id.* The Supreme Court came to this determination because "[t]hese terms have not been construed in their narrow literal sense but, rather, with the reach necessary to reflect the broad scope of constitutional principles." *Goldstein*, 412 U.S. at 561. The Copyright

37

Office is specifically asking this Court to apply the sort of narrow literal language the Supreme Court has rejected in the past.

By contrast, granting copyright to the Work would ensure that "[c]opyright protection extends to **all** 'original works of authorship fixed in any tangible medium' of expression." *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013 (8th Cir. 2006) (emphasis added); *see also Bell Atl. Bus. Sys. Services, Inc. v. Hitachi Data Sys. Corp.*, C 93-20079 JW, 1995 WL 836331, at *3 (N.D. Cal. Dec. 14, 1995) (same). This would result in public benefit by encouraging people to develop and use creative AI to generate and disseminate socially valuable goods.

4.    The Copyright Office Has No Support For Its View that Original Works of Authorship Require Natural Persons

Despite having no authority to support its position, the Copyright Office argues that it is Dr. Thaler who misinterprets the Act's language, while the Copyright Office employs smoke and mirrors to attempt to obfuscate plain language. The Copyright Office effectively handwaves term limits not connected to the life of the author by looking solely at the anonymous and pseudonymous provisions, calling them "special provisions." Opp. 13 (citing H.R. REP. NO. 94-1476, at 137)(APPX 134).

This argues past the point. While these provisions may have historically involved natural persons, that is very different than there being a Human Authorship Requirement. The Copyright Office ignores works for hire's disconnect from the life of the author given that authors are often, and uncontroversially, *not human*. Thus, the Copyright Office, by ignoring clear carve-outs for non-human creators, misconstrues the plain language of the Copyright Act.

There is nothing inherently human about an "idea." Essentially, the Copyright Office begins with a factual assumption that it is not legally in the position to take to justify a claim that every requirement is inherently human-centric, such that an AI system cannot create a work of authorship. But the cases relied on by the Copyright Office like *Mazer*, 347 U.S. 201 never identify that a tangible idea must come from a natural person. *See Mazer v. Stein*, 347 U.S. 201, 214 (1954) ("They must be original, that is, the author's tangible expression of his ideas.") Likewise, there is nothing about the language regarding an "originator" that is inherently human, as the Work in this case owns its proximate origin to a machine. *See Goldstein v. California*, 412 U.S. 546, 561 (1973) ("While an 'author' may be viewed as an individual who writes an original

composition, the term in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.'")

*Urantia* and *Naruto* do not support the Copyright Office's arguments. *Urantia* involved alleged divinity in creation, but AI exists in the physical world. *Compare Urantia Found. v. Kristen Maaherra*, 114 F.3d at 958 ("[a]t the very least, for a worldly entity to be guilty of infringing a copyright, that entity must have copied something created by another worldly entity."). It is surprising the Copyright Office would attempt to rely on this case for support, given the 9th Circuit even went out of its way to clarify that its holding did not apply to AI-Generated works, referring to the instant controversy without resolving it, "[t]he copyright laws, of course, do not expressly require 'human' authorship, and considerable controversy has arisen in recent years over the copyrightability of [AI-Generated Works]." *Id.* at 958.

Below, the Copyright Office admitted that *Naruto* was an animal standing case. The Copyright Office writes that "'Animals other than humans' cannot sue under the Act." Opp. at 17; APPX 138. The Copyright Office further writes that "'[I]f Congress and the President intended to take the extraordinary step of authorizing animals' to sue, the statute

would need to state so clearly." Opp. at 17; APPX 138. This language all relates to *standing*, not the existence of copyright. For the avoidance of doubt, Dr. Thaler is suing on his own behalf, whereas his AI is not a party to this case. No one is claiming that an AI system is a legal person or entitled to any kind of right. Dr. Thaler, however, himself undisputedly a natural person, is entitled to a right. He is entitled to own a copyright in the Work and he is seeking this Court's holding in support of that right.

The Copyright Office's reliance *Kelley* suffers from a similar flaw. *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 304 (7th Cir. 2011). *Kelley* involved moral rights claim under the Visual Artists Rights Act of 1990, which is not at issue in this case. *Id.* at 300. In turn, the moral rights claim depended on there being copyright in a *garden. Id.* The nature of a garden is that is always changing, there is no *fixation*, not inadequate creativity. While the Kelley court stated that authors are human, this was in the context of holding that authorship cannot depend on forces of nature. "[W]orks owing their form to the forces of nature cannot be copyrighted." *Id.* at 305. The garden "originate[s] in nature, and natural forces—not the intellect of the gardener…" Owing a form to nature means there was no "intelligence" involved. *Id.* What the Court must contend

with is that the AI in the present case does have intelligence, it is just artificial.

None of *Urantia*, *Naruto*, or *Kelley* involved AI-Generated works, and the Work is not one owing its origin to divine forces, monkeys, or nature. Even in dicta, none of these cases do the work the Copyright Office is looking for.

If AI-Generated Works are to be denied copyright protection, this must be done by Congress rather than the Courts. "Congress' silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). The bottom line is that authorship has an extremely broad definition under the Act, with no restriction on AI authorship. There is a long history of non-human authors in copyright jurisprudence. The Copyright Office must strain the language and rely on inapt case law and sweeping, controversial proclamations regarding philosophy of mind that are far removed from the Act's plain language, and it amounts to ignoring the statute's own plain language.

## B.    Dr. Thaler Is the Only Possible Owner of Copyright in the Work

As the copyright exists, the question arises as to who owns it, and

the only logical answer is the copyright claimant, Dr. Thaler. To be clear, below the Copyright Office misconstrued this argument, which does *not* address the question of whether copyright exists. It addresses the issue of ownership if the Court finds that copyright in the Work does exist.  Of course, an AI system is not a legal person and so cannot have legal rights or obligations such as ownership of intellectual property rights.

The District Court never reached this issue by holding that it was putting the cart before the horse and also that autonomous creation in the administrative record does not show human involvement. APPX 191. The latter conclusion was, however, based on a misunderstanding of the record below.

As set out in the original registration document, the copyright owner was listed as Dr. Thaler as the "creator of the Creativity Machine." APPX 043. This statement did not operate in a vacuum from the first instance, and it was further explained and refined in letters to the Copyright Office after the registration was denied, and when Dr. Thaler sought reconsideration. APPX 063. As explained, "Alternately, obvious ownership options other than the AI include the machine's owner, user or programmer(s). In the present case, the current applicant, Stephen

Thaler, is the owner of the Al that generated the [AI-Generated Work] and should thus be the owner of any copyright. Stephen Thaler was also the AI's **user and programmer**. There is no other individual involved with the Al in the present case who would be an appropriate recipient of any copyright to the submitted [Work]." APPX 063 (emphasis added).

Dr. Thaler was entirely, and likely unusually, transparent in disclosing that he did not make the sort of contribution to the Work that would traditionally directly entitle a person to authorship. But it was always before the Copyright Office that the Creativity Machine was a device created and operated by Dr. Thaler, so it was acting at his direction and under his control. The word "autonomous" does not mean that an AI system is somehow magical or intergalactic. It merely denotes that, as is now a fairly routine capability of generative AI systems, a machine can engage in an activity that would otherwise require cognition—whether that is driving a vehicle, drafting an appellate brief (not this one), or generating a visual work. Autonomy is one of the defining characteristics of AI systems. Simon Cheesterman, We, the Robots?  Regulating Artificial Intelligence and the Limits of the Law, pp. 31 – 62 (CUP 2021) ("A key feature of modern AI systems is the ability to

44

operate without human intervention. It is commonly said that such systems operate 'autonomously'.)

As such, Dr. Thaler by virtue of being the owner, creator, and operator of the Creativity Machine has multiple legal bases to be the right holder of the copyright in the Work. If the Creativity Machine is legally the author then Dr. Thaler owns the Work's copyright through operation of common law property transfer. Otherwise, Dr. Thaler is the author and copyright owner either through the work for hire doctrine or his control of his AI system.

1.    Dr. Thaler Is Right Holder Based on His Ownership of The Creativity Machine

As the Act explicitly states, copyright can transfer "by operation of law." See 17 U.S.C. § 204(a). Such transfers by operation of law, include intestate succession (*Griffin v. Sheeran*, 351 F. Supp. 3d 492, 501 (S.D.N.Y. 2019)) and other similar automatic state-law processes. *See e.g. Fantasy, Inc. v. Fogerty*, 664 F. Supp. 1345, 1356 (N.D. Cal. 1987), aff'd, 984 F.2d 1524 (9th Cir. 1993), rev'd, on other grounds 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) (Discussing how a copyright transfer made via "transfer of assets from a dissolving corporation to its

shareholders is a transfer by operation of law."); *U.S. Home Corp. v. R.A. Kot Homes, Inc.*, 563 F. Supp. 2d 971 (D. Minn. 2008) (Copyright transfer was automatic through merger under Minnesota law.); *see also Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 311 (2d Cir. 1939), cert. denied, 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939) (The Second Circuit allowed an infringement suit to proceed "since possession of the manuscript by the German publishers is evidence of [copyright] ownership, and the transfer in question is sufficient to convey a title good as against third persons"). In such instances, no written agreement is necessary, as explicitly stated in the statute. Two transfers from the Creativity Machine to Dr. Thaler "by operation of law" apply in this circumstance: (1) the "fruit of the tree," and (2) the right of first possession.

a.    General Principles of Property Begetting Property Remaining with the Property Owner Provide the Copyright to Dr. Thaler

Professor Thomas W. Merrill of Colombia Law School explains that the fruit of the tree doctrine, or "accession," should be viewed like a force, as it "operates like a magnet. Imagine that the contested object is like an iron pellet dropped on a table covered by various magnets; the pellet

moves toward and becomes affixed to the magnet that exerts the strongest magnetic force on it, as determined by the size and power of the magnets as well as their physical proximity to the pellet. Similarly, prominent connection for purposes of accession is a function not merely of physical proximity but also other forces (mass, for example) that enter into our perception of what it means to say that something has a prominent connection to something else." Thomas W. Merrill, *Accession & Original Ownership*, 1 J. Legal Analysis 459, 463 (2009). There are numerous examples in the law of property acceding in ways that appear mundane and inherently reasonable. For instance, if Dr. Thaler owned a fruit tree, he would own the fruit from that tree. This does not require the tree to execute a written agreement to transfer the fruit, the fruit belongs to Dr. Thaler by virtue of his ownership of the tree. Similarly, if Dr. Thaler owned a cow that birthed a calf, "[t]he general rule, in the absence of an agreement to the contrary, is that the offspring or increase of tame or domestic animals belongs to the owner of the dam or mother." (*Carruth v. Easterling*, 247 Miss. 364 (1963). This has been referred to as the "doctrine of increase." Thomas W. Merrill, *Accession & Original Ownership*, 1 J. Legal Analysis 459, 463 (2009).

47

Indeed, in a 6th Century case sometimes cited as the earliest example of copyright, King Diarmed of Ireland recognized this ancient rule of property and its relevance to intangible property in pronouncing that, "to every cow belongs her calf, therefore to every book belongs its copy." The Cathach / The Psalter of St Columba, ROYAL IRISH ACADEMY (Aug. 31, 2015), www.ria.ie/cathach-psalter-st-columba (last visited Aug 7, 2022).

The same principle applies in the context of newly formed land caused by alluvial formations vesting in the riparian landowner. *See State of Nebraska v. State of Iowa*, 143 U.S. 359, 365–66 (1892). In addition, the Supreme Court has repeatedly upheld the same general principle ruling that interest also flows to the owner of the principal. *See Brown v. Legal Found. of Washington*, 538 U.S. 216, 235 (2003)*; Phillips v. Washington Legal Found.*, 524 U.S. 156, 164–71 (1998)*; Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162–64 (1980)*).*

Just like with all these examples, Dr. Thaler created and owns the original property—the Creativity Machine. Its output, of all kinds, automatically vests in him. That is evident in the fact that if his AI had made a physical painting, he would own that tangible property. Just as

48

interest is a concept, an intangible form of property like copyright also belongs in the owner of the underlying property "by process of law." Another way to view the principle comes through accession to, for instance, improvements to property. "[T]he general rule is quite well settled that, where the articles later attached to an automobile or other principal article of personal property became so closely incorporated with the principal article that they cannot be identified and detached therefrom without injury to the automobile or principal article, such articles become part of the machine or principal article to which they are so attached and will pass by accession to one having a chattel mortgage or other lien upon the principal article, if the lien is enforced." *In re C Tek Software, Inc.*, 127 B.R. 501, 507–08 (Bankr. D.N.H. 1991). In this case, therefore, if copyright initially vests in an AI system that cannot hold property, the owner of the AI would own any inseparable addition to his property.

b.    Dr. Thaler Has the Right of First

Possession to the Copyright

Alternately, another bedrock legal concept, and "one of the most basic premises of property law," is that "the first person to possess an object is its owner." João Marinotti, *Possessing Intangibles*, 116 Nw.

49

U.L. Rev. 1227, 1238 (2022). In Professor Marinotti's article on intangible property, he explains the way to understand first possession, and possession, is not through any physical means but "conceptualized as a means of information exchange rather than a physical fact." *Id*.

Dr. Thaler owns copyright in the Work by virtue of being the first party to possess it and communicate his ownership. "[T]he common and civil law (both of which accept the desirability of private ownership) have responded with the proposition that the taking possession of unowned things is the only possible way to acquire ownership of them." Richard A. Epstein, Possession as the Root of Title, 13 Georgia Law Review 1221, 1222 (1979). The rule of first possession is simple, but like accession, foundational to functioning systems of private property. If the AI made a piece of property, and if no other party was entitled to ownership by virtue of their relationship to the AI, then the Work was unowned property which Dr. Thaler took title to by virtue of first possession.

The law regarding discovered goods, has been consistently that the finder has a right "to any one, unless it be to the right owner, he shall be charged for them." *Coykendall v. Eaton*, 1869 WL 5957 (N.Y. Gen. Term. 1869). This has been enshrined in this country's earliest laws, becoming hornbook and taught in first-year law courses

henceforth. *See e.g. Pierson v. Post*, 1805 WL 781 (N.Y. Sup. Ct. 1805) (granting full property rights in a hunted fox to the farmer who ultimately claimed it, not the hunter who fruitlessly pursued it).

As previously cited, this principle has historically applied in copyright law without controversy for a party to claim copyright against any third-persons. In *Houghton Mifflin Co.* the Second Circuit explained this exact concept: "It is to be noted that, if an analogy is to be drawn between literary property and ordinary chattels . . . since possession of the manuscript by the German publishers is evidence of ownership, [] the transfer in question is sufficient to convey a title good as against third persons, without any rights in the premises. That analogy has been asserted and relied on in [copyright] cases. We think it is sound and justifies the plaintiff's claim [of ownership as necessary for an infringement action]." *Houghton Mifflin Co. v. Stackpole Sons*, 104 F.2d 306, 311 (2d Cir. 1939) (citing copyright ownership cases where this analogy had previously been applied, *Callaghan v. Myers*, 128 U.S. 617, 658 (1888); *Gerlach-Barklow Co. v. Morris & Bendien*, 23 F.2d 159, 161 (2d Cir. 1927)).

Likewise, Dr. Thaler possesses the machine, owns the machine, developed the machine, operated the machine, possesses the Work, and possesses every indica of ownership of the Work. In its possession he holds more than just the digital copy, but also the rights to the

51

copyright embodied within it as well, certainly as to anyone who could bring a lawsuit to challenge him. As the Copyright Office has noted, lacking legal personhood, the Creativity Machine lacks standing so Dr. Thaler having a title that is "good as to third persons" remains secure.

    2.    <u>Alternately, Dr. Thaler Is the Work's Author So No Property Transfer Is Necessary</u>

        a.    <u>Dr. Thaler is the Owner As the Work Is a Work for Hire</u>

In the alternate, given the way the AI was created, how it operates, and Dr. Thaler's ownership of it, Dr. Thaler is the author pursuant to the work for hire doctrine, and therefore the original owner. Copyrights commonly vest in employers by virtue of the "work for hire" provision the Act. 17 U.S.C. § 201 ("Copyright in a work protected under this title vests initially in the author or authors of the work . . . [i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author. . . .") Dr. Thaler's AI was acting as an employee solely for purposes of the work for hire doctrine.

The Copyright Office concocts a parade of horribles to argue that it would be a poor precedent to cast an AI as employee, but it ignores that applying agency principles in the limited context of copyright would not

render an AI as an employee with rights, in fact, the application here enforces human rights to AI output.

In his registration form, Dr. Thaler listed the Work as a "work for hire," in which case the "author" for statutory purposes is Dr. Thaler. *See* APPX 024. Thus, if the AI cannot be the "author," then the Work is a work for hire. The AI, in the sense that it is anything, is an autonomous actor operating under the direction of its programmer and user. As previously noted, the record shows that Dr. Thaler described himself as the Creativity Machine's "operator." It bears repeating that the Court cannot find "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ardmore Consulting Group, Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015) (internal quotation marks and citations omitted). If such a fact would preclude registration, it is not on the record. What is on record is Dr. Thaler's statement that he programmed and used the machine, and that it created the Work at issue as a work made for hire. US0002; US0024.

A determination that work for hire applies would not have any broader implication, as shown in *Horror Inc. v. Miller*, 15 F.4th 232, 244–47 (2d Cir. 2021). In this case, the Second Circuit explicitly examined the

question of whether applications of terms in common between the National Labor Relations Act and the Copyright Act require the same interpretation, and soundly rejected it. *Id*. The reason underlying the Court's determination is that the "Copyright Act and the NLRA serve altogether different purposes and focus on different economic sectors." *Id*. at 244. As such, the terms used in the Act can have different meanings, and expressly, "employee" also has different meanings. *Id*. at 245. Instead, the Court held that the standard *Reid* factors must apply. *Id*.

Applying the *CCNV* factors, on balance, the Creativity Machine qualifies as an employee solely in the work for hire context. While the Copyright Office argues that the AI cannot meet all the factors, the Supreme Court already made it explicitly clear that not all employment factors are necessary to establish employment for work for hire purposes, as its own analysis weighed some factors for and some against independent contractor status. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989). Thus, the fact that not all factors apply does not prevent the finding of employment for purposes of the work for hire doctrine. The level of control, lack of independence, and

overall operation and direction of the AI system Dr. Thaler exercised

creates, on balance, a clear enough level of control to justify employee

status for purposes of copyright. *See id.*

Control and ownership are clear on the face of the application and

the letters to the Copyright Office stating that Dr. Thaler owned,

programmed, and used the AI. APPX 047 ("In the present case, the

current applicant, Stephen Thaler, is the owner of the AI that generated

the [AI-Generated Work] and should thus be the owner of any

copyright. Stephen Thaler was also the AI's user and programmer.") To

the extent the Copyright Office attempts to recast this argument to be

that Dr. Thaler directed the AI in the same manner as one would use a

photoshop, that has never been the argument. The AI performed the

traditional elements of authorship, but in terms of ownership, and

control of the AI itself, Dr. Thaler is the "user" and "programmer" who

directed the AI to make the Work, which is in a manner entirely

analogous to a work for hire. A very high level of control is clear on the

record, as Dr. Thaler programmed and invented the AI, so the

Copyright Office's argument that there is inadequate direction for it to

be an employee is contrafactual, and Dr. Thaler's explanation cannot be challenged given the procedural posture of this case.

The Copyright Office's semantic argument that terminology used in the Copyright Act only applies to humans does not alter the prior analysis. Although the Copyright Office argues that the personal "his" and "her" that refer to employee in 17 U.S.C. § 101 forecloses an AI, one could easily come to the opposite conclusion. Many natural persons do not identify with gendered pronouns, gendered pronouns are used to refer to non-human animals, and gendered pronouns are popularly used to refer to AI systems such as Siri or Alexa. Ordinary meanings also change over time—a "computer" once referred to a natural person making computations, for instance.

### b.    In the Alternate, Dr. Thaler is Directly the Work's Author

Finally, while Dr. Thaler did not directly create the Work in the manner a traditional author would, he did create and use the Creativity Machine to make the Work. Thus, he is the ultimate originator of the Work which would not exist "but for" Dr. Thaler.

If the Work is eligible for copyright protection but this requires a

specific, identifiable human author, and that this cannot be via the work for hire doctrine, then Dr. Thaler is the only possible candidate to be the Work's author. Despite not making a traditional contribution, he was responsible for creating and operating the AI system that made the work, so he was certainly the producer of the work in the sense that he undertook to have the work created. On the record, he is also the only natural person who make an indirect contribution to the creation of the work (e.g., training the AI system that made the work). Potentially expanding the meaning of authorship would be vastly preferable to denying copyright entirely for AI-Generated Works. See Sarony at 57-58, 61. See also John Tehranian, *Copyright's Male Gaze: Authorship & Inequality in A Panoptic World*, 41 Harv. J.L. & Gender 343, 385 (2018) ("*Sharing the same etymological root, the terms "authority" and "author" derive from the Latin word 'auctor,' which refers to an originator or promoter. As such, the search for authorship is a quest to determine the originator of a work or, quite literally, the person who possesses authority over it.*").

This case is likely unusual with respect to Dr. Thaler's transparency and candor which allow the Work to be identified as AI-

Generated. In other cases applicants may attempt to register AI-Generated Works while neglecting to mention, or by misrepresenting, the contribution of AI systems. Even leaving that aside, the Copyright Office's Human Authorship Requirement does not provide a workable standard for the specific level of contribution required by a natural person versus an AI system. Nor could it reasonably provide such a standard, as there is not a clear dividing line in the spectrum between a human artist receiving assistance from photoshop, and a human artist typing a prompt into Midjourney and receiving a piece of visual art. Prohibiting protection for AI-Generated Works is not only counter to the text and purpose of the Copyright Act, it is an unworkable standard for both the Copyright Office and litigants in infringement matters.

## X.     CONCLUSION

For the foregoing reasons, the Appellant Stephen Thaler respectfully asks this Court to reverse the district court's order and judgment below, and grant summary judgment to Stephen Thaler, and deny the Copyright Office's motion for summary judgment.

## CERTIFICATE OF COMPLIANCE

This response complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,539 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Microsoft Office Word 2016 in Century Schoolbook 14-point font.

DATED:  January 22, 2024          BROWN NERI SMITH & KHAN LLP


                                  By:  */s/ Ryan Abbott*
                                       Ryan Abbott
                                       Timothy G. Lamoureux
                                       Attorneys for Plaintiff and
                                       Appellant Stephen Thaler

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2024, I electronically filed this Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

DATED:  January 22, 2024          BROWN NERI SMITH & KHAN LLP

By:  */s/ Ryan Abbott*
       Ryan Abbott
       Timothy G. Lamoureux
       Attorneys for Plaintiff and
       Appellant Stephen Thaler

**<u>ADDENDUM</u>**

# <u>TABLE OF CONTENTS</u>

17 U.S.C. § 101 ....................................................................3a

17 U.S.C. § 102 ..................................................................13a

17 U.S.C. § 201 ..................................................................14a

17 U.S.C. § 203 ..................................................................16a

17 U.S.C. § 204(a) ..............................................................19a

17 U.S.C. § 301(a) ..............................................................20a

17 U.S.C. § 302(c) ..............................................................21a

28 U.S.C. § 1291 ................................................................22a

28 U.S.C. § 1331 ................................................................23a

5 U.S.C. § 702 ....................................................................24a

5 U.S.C. § 706 ....................................................................25a

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1—SUBJECT MATTER AND SCROPE OF COPYRIGHT

**\* \* \***

## § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate

3a

and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications

4a

which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized

5a

Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is—

> **(1)** the Universal Copyright Convention;
>
> **(2)** the Geneva Phonograms Convention;
>
> **(3)** the Berne Convention;
>
> **(4)** the WTO Agreement;
>
> **(5)** the WIPO Copyright Treaty;
>
> **(6)** the WIPO Performances and Phonograms Treaty; and
>
> **(7)** any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the

Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

**(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

**(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of

the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if—

**(1)**    in the case of a published work, the work is first published--

   **(A)**    in the United States;

   **(B)**    simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

   **(C)**    simultaneously in the United States and a foreign nation that is not a treaty party; or

9a

**(D)** in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

**(2)** in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

**(3)** in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is—

**(1)** a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

**(2)**    a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include—

**(A)(i)** any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

   **(ii)**    any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

   **(iii)**   any portion or part of any item described in clause (i) or (ii);

**(B)**   any work made for hire; or

**(C)**   any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is—

   **(1)**    a work prepared by an employee within the scope of his or her employment; or

   **(2)**    a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords,

pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

**(A)**    shall be considered or otherwise given any legal significance, or

**(B)**    shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1—SUBJECT MATTER AND SCROPE OF COPYRIGHT

**\* \* \***

## § 102. Subject Matter Of Copyright: In General

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

> **(1)** literary works;
> **(2)** musical works, including any accompanying words;
> **(3)** dramatic works, including any accompanying music;
> **(4)** pantomimes and choreographic works;
> **(5)** pictorial, graphic, and sculptural works;
> **(6)** motion pictures and other audiovisual works;
> **(7)** sound recordings; and
> **(8)** architectural works.

**(b)** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
### CHAPTER 2—COPYRIGHT OWNERSHIP AND TRANSFER

**\* \* \***

## § 201. Ownership of Copyright

**(a) Initial Ownership.**--Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b) Works Made for Hire.**--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**(c) Contributions to Collective Works.**--Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

**(d) Transfer of Ownership.—**

**(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

**(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner

of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

**(e) Involuntary Transfer.**--When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
### CHAPTER 2—COPYRIGHT OWNERSHIP AND TRANSFER

**\* \* \***

### § 203. Termination of transfers and licenses granted by the author

**(a) Conditions for Termination.**--In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

**(1)** In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

**(2)** Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

**(A)** The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

**(B)** The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

16a

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

(4) The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(b) **Effect of Termination.**--Upon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author, authors, and other persons owning termination interests under clauses (1) and (2) of subsection (a),

17a

including those owners who did not join in signing the notice of termination under clause (4) of subsection (a), but with the following limitations:

**(1)** A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

**(2)** The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of subsection (a). The rights vest in the author, authors, and other persons named in, and in the proportionate shares provided by, clauses (1) and (2) of subsection (a).

**(3)** Subject to the provisions of clause (4) of this subsection, a further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under clause (2) of this subsection, as are required to terminate the grant under clauses (1) and (2) of subsection (a). Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under clause (2) of this subsection, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this clause.

**(4)** A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the persons provided by clause (3) of this subsection and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of subsection (a).

**(5)** Termination of a grant under this section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

**(6)** Unless and until termination is effected under this section, the grant, if it does not provide otherwise, continues in effect for the term of copyright provided by this title.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 2—COPYRIGHT OWNERSHIP AND TRANSFER

**\* \* \***

## § 204. Execution of transfers of copyright ownership

**(a)** A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 3—DURATION OF COPYRIGHT

**\* \* \***

### § 301. Preemption with respect to other laws

**(a)** On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 3—DURATION OF COPYRIGHT

**\* \* \***

### § 302. Duration of copyright: Works created on or after January 1, 1978

**(c) Anonymous Works, Pseudonymous Works, and Works Made for Hire.**--In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

21a

# UNITED STATES CODE
## TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
## PART IV. JURISDICTION AND VENUE
## CHAPTER 83. COURTS OF APPEALS

**\* \* \***

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

# UNITED STATES CODE
## TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
## PART IV. JURISDICTION AND VENUE
## CHAPTER 85. DISTRICT COURTS; JURISDICTION

**\* \* \***

## § 1331. Federal Question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

23a

## UNITED STATES CODE ANNOTATED
## TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
## PART I. THE AGENCIES GENERALLY
## CHAPTER 7. JUDICIAL REVIEW

* * *

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

UNITED STATES CODE ANNOTATED
TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**\* \* \***

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.