**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5233**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

STEPHEN THALER, an individual,

Plaintiff-Appellant,

v.

SHIRA PERLMUTTER, in her official capacity as Register of Copyrights and Director of the United States Copyright Office, and U.S. COPYRIGHT OFFICE,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

### BRIEF FOR APPELLEES

———————————

*Of Counsel:*

SUZANNE V. WILSON
  *General Counsel and Associate
  Register of Copyrights*

EMILY L. CHAPUIS
  *Deputy General Counsel*

ANDREW FOGLIA
  *Deputy Director of Policy and
  International Affairs*

MARK T. GRAY
JOHN R. RILEY
  *Assistant General Counsel*

  *U.S. Copyright Office*

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

DANIEL TENNY
NICHOLAS S. CROWN
  *Attorneys, Appellate Staff
  Civil Division, Room 7325
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-5365*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Under D.C. Circuit Rule 28(a)(1), I certify the following.

### A.   Parties and Amici

Plaintiff-appellant is Stephen Thaler. Defendants-appellees are Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and the U.S. Copyright Office. An amicus brief supporting appellants has been filed in this Court by Shlomit Yanisky-Ravid, Ge Chen, Adam Guttentag, Lawrence Lessig, Christopher Mason, and Elisa Shupe.

### B.   Rulings Under Review

The ruling under review is the district court (Howell, J.) order (Dkt. No. 23) and memorandum opinion (Dkt. No. 24), entered August 18, 2023, granting summary judgment to defendants-appellees. The reported opinion is available at ____ F. Supp. 3d. ____, 2023 WL 5333236 (D.D.C.).

### C.   Related Cases

This case has not previously been before this Court or any court other than the district court. We are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

_/s/ Nicholas S. Crown_____
Nicholas S. Crown

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iv

GLOSSARY ................................................................................................ ix

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION............................................................. 3

STATEMENT OF THE ISSUE.................................................................... 3

PERTINENT STATUTES AND REGULATIONS ...................................... 3

STATEMENT OF THE CASE ..................................................................... 3

      A.    Statutory and Regulatory Background. ..................................... 3

      B.    Factual Background. ................................................................ 14

      C.    Prior Proceedings. ...................................................................17

SUMMARY OF ARGUMENT .................................................................... 18

STANDARD OF REVIEW ......................................................................... 19

ARGUMENT................................................................................................20

The Copyright Office Properly Denied Plaintiff's Application to
Register a Copyright for a Work Lacking Human Authorship...........20

      A.    Copyright protection requires human authorship....................20

            1.    The plain text of the Copyright Act confirms that an
author is human. ...........................................................20

            2.    Judicial precedent supports the human-authorship
requirement...................................................................28

3.    The Copyright Office has consistently interpreted the Copyright Act to require human authorship with Congress' approval. ......................................................... 32

B.    Plaintiff's contrary arguments lack merit. ................................ 36

CONCLUSION ............................................................................................ 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Atari Games Corp. v. Oman,*
   979 F.2d 242 (D.C. Cir. 1992) ................................................................ 47

*Bragdon v. Abbott,*
   524 U.S. 624 (1998) ............................................................................... 33

*Brown v. Davenport,*
   596 U.S. 118 (2022) ............................................................................... 45

*Burrow-Giles Lithographic Co. v. Sarony,*
   111 U.S. 53 (1884) ........................................... 10-11, 12, 28, 29, 30, 35, 39

*Community for Creative Non-Violence v. Reid*:
   490 U.S. 730 (1989) ........................................................................... 21, 27
   846 F.2d 1485 (D.C. Cir. 1988), *aff'd,*
      490 U.S. 730 (1989) ...................................................................... 43, 44

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003) ........................................................................... 25, 45

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991) ....................................................................... 4, 41, 47

*Food Mktg. Inst. v. Argus Leader Media,*
   139 S. Ct. 2356 (2019) .......................................................................... 20

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC,*
   139 S. Ct. 881 (2019) ............................................................................. 8

*Georgia v. Public.Resource.Org, Inc.,*
   140 S. Ct. 1498 (2020) ...................................................................... 44, 45

*Google LLC v. Oracle Am., Inc.,*
   141 S. Ct. 1183 (2021) .......................................................................... 20

*Jones v. Hendrix,*
   599 U.S. 465 (2023) ............................................................................... 25

*Kelley v. Chicago Park Dist.,*
   635 F.3d 290 (7th Cir. 2011) ............................................................... 30, 31

iv

*Kimble v. Marvel Entm't, LLC,*
   576 U.S. 446, 456 (2015) ........................................................ 45

*Naruto v. Slater,*
   888 F.3d 418 (9th Cir. 2018) ................................................. 32

*Sandoz Inc. v. Becerra,*
   57 F.4th 272 (D.C. Cir. 2023) .............................................. 19

*Thaler v. Vidal,*
   43 F.4th 1207 (Fed. Cir. 2022), *cert. denied,*
   143 S. Ct. 1783 (2023) ......................................................... 44

*Trade-Mark Cases, In re,*
   100 U.S. 82 (1879) ................................................. 10, 30, 34

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,*
   595 U.S. 178 (2022) ............................................................... 9

*Urantia Found. v. Maaherra,*
   114 F.3d 955 (9th Cir. 1997) ................................................ 31

*Wheaton v. Peters,*
   33 U.S. 591 (1834)................................................................ 43

## U.S. Constitution:

Art. I, § 8, cl. 8 ..................................................... 4, 25, 28, 44

## Statutes:

Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124, 124............................................ 4

Act of March 3, 1865, ch. 126, § 1, 13 Stat. 540, 540.................................... 28

Act of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212...................................... 28

Administrative Procedure Act,
   5 U.S.C. § 706(2)(A) ............................................................ 20

Copyright Act of 1909,
   Pub. L. No. 60-349, § 23, 35 Stat. 1075, 1080.......................................... 28

Copyright Act of 1976:

17 U.S.C. § 101 *et seq.* ................................................................................. 1

17 U.S.C. § 101 ............................................ 5, 6, 7, 23, 25, 26, 27, 36, 37

17 U.S.C. § 102(a) ........................................................ 4, 20, 21, 41, 47

17 U.S.C. § 102(b) ................................................................ 40, 41

17 U.S.C. § 106 ........................................................................ 4

17 U.S.C. § 106A ................................................................ 30, 34

17 U.S.C. § 201(a) ............................................................ 4, 21, 37

17 U.S.C. § 201(b) ............................................................ 6, 26, 36

17 U.S.C. § 201(d) ...................................................................... 6

17 U.S.C. § 201(d)(1) .................................................................. 42

17 U.S.C. § 202 .......................................................................... 43

17 U.S.C. § 203 .......................................................................... 7

17 U.S.C. § 203(a) .............................................................. 7, 22, 42

17 U.S.C. § 203(a)(2) ............................................................... 7, 23

17 U.S.C. § 203(a)(5) .................................................................. 22

17 U.S.C. § 203(b) ................................................................. 7, 22

17 U.S.C. § 204(a) .............................................................. 6, 22, 42

17 U.S.C. § 301(a) ...................................................................... 44

17 U.S.C. § 302(a) ............................................................ 4, 23, 24

17 U.S.C. § 302(b) ................................................................ 5, 23

17 U.S.C. § 302(c) ............................................................ 5, 6, 25, 26

17 U.S.C. § 302(d) ................................................................ 5, 23

17 U.S.C. § 302(e) ................................................................ 5, 24

17 U.S.C. § 304(a)(1)(C) ............................................................ 5, 24

17 U.S.C. § 304(a)(1)(C)(i) ........................................................ 5, 24

17 U.S.C. § 304(a)(1)(C)(ii) ....................................................... 5, 24

17 U.S.C. § 304(a)(1)(C)(iii)-(iv) ................................................. 5, 24

17 U.S.C. § 304(c)-(d) ........................................................ 7, 22, 23

17 U.S.C. §§ 408–412 .................................................................. 7

17 U.S.C. § 408(a) ...................................................................... 8

17 U.S.C. § 408(a)-(b) .................................................................. 8

17 U.S.C. § 409 .......................................................................... 8

17 U.S.C. § 409(2) ...................................................................... 24

17 U.S.C. § 410(a) ...................................................................... 8

17 U.S.C. § 410(b) ...................................................................... 8

17 U.S.C. § 410(c) ...................................................................... 9

17 U.S.C. § 411(a) ...................................................................... 8

17 U.S.C. § 411(b)(1) .................................................................. 46

17 U.S.C. § 411(b)(1)(A) ................................................................ 9

17 U.S.C. § 412 ................................................................... 9
17 U.S.C. §§ 504–505 ......................................................... 9
17 U.S.C. § 506(e) ........................................................ 8, 46
17 U.S.C. § 701 ................................................................. 34
17 U.S.C. §§ 701–702 ......................................................... 7
17 U.S.C. § 701(b)(1) ........................................................ 13
17 U.S.C. § 701(b)(4) ........................................................ 13
17 U.S.C. § 701(e) ............................................................ 10
17 U.S.C. § 702 ................................................................... 9
17 U.S.C. § 708 ................................................................... 8

28 U.S.C. § 1291 ................................................................. 3

28 U.S.C. § 1331 ................................................................. 3

## Regulations:

37 C.F.R. § 202.3(a)(1) ....................................................... 9

37 C.F.R. § 202.5 ............................................................... 15

37 C.F.R. § 202.5(a) ............................................................. 9

37 C.F.R. § 202.5(b) ............................................................. 9

37 C.F.R. § 202.5(c) ........................................................ 9, 15

37 C.F.R. § 202.5(f) ............................................................. 9

37 C.F.R. § 202.5(g) ........................................................... 10

## Rule:

Fed. R. App. P. 4(a)(1)(B) ..................................................... 3

## Legislative Material:

H.R. Rep. No. 94-1476 (1976) ......................................... 28, 33

**Other Authorities:**

*Artificial Intelligence and Copyright*,
　88 Fed. Reg. 59,942 (Aug. 30, 2023) ....................................................... 13

*Copyright Registration Guidance: Works Containing Material
　Generated by Artificial Intelligence*,
　88 Fed. Reg. 16,190 (Mar. 16, 2023) ......................... 12, 13, 35, 40, 45, 46

86 Fed. Reg. 3205 (Jan. 14, 2021) .............................................................. 10

Letter from Ryan Abbott, Professor of Law & Health Scis.,
　Univ. of Surrey, to U.S. Copyright Office 1 (Oct. 21, 2023),
　https://perma.cc/KG7J-2LUF ........................................................... 38

2 William F. Patry, *Patry on Copyright* § 3.19 (2010), Westlaw
　(database updated Sept. 2023) ............................................................ 30

U.S. Copyright Office:
*Compendium of Copyright Office Practices* (1st ed. 1973),
https://perma.cc/J7ML-BZK6:
　§ 2.8.3(I)(a)(1)(b) ............................................................... 11, 33

*Compendium of Copyright Office Practices* (2d ed. 1984),
　https://perma.cc/52MX-6YPD:
　　§ 202.02(b) .................................................... 11-12, 30, 34
　　§ 503.03(a) .............................................................. 30

*Compendium of U.S. Copyright Office Practices* (3d. ed. 2021),
　https://perma.cc/9N9N-C3VU ........................................................ 10
　　§ 306 ...........................................................................10, 34
　　§ 313.2 ....................................................................10, 11, 34, 39
　　§ 605.3(B) ...................................................................... 46
　　§ 605.6 ........................................................................... 46
　　§ 605.7 ........................................................................... 46

*Sixty-Eighth Annual Report of the Register of Copyrights
　for the Fiscal Year Ending June 30, 1965* (1966),
　https://perma.cc/QU7P-TY6N ............................................... 11, 33, 39

## GLOSSARY

| | |
|---|---|
| AI | Artificial intelligence |
| Compendium | Compendium of Copyright Office Practices |
| Copyright Act or Act | Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* |
| Copyright Office | United States Copyright Office |
| JA | Appendix |

## INTRODUCTION

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq*., protects original works of authorship fixed in a tangible medium of expression. This appeal presents the question whether *human* authorship is required to obtain copyright protection.

When a party claims to be the owner or author of a work protected by copyright, they may seek to register that claim with the United States Copyright Office. The appellant here, Dr. Stephen Thaler, applied to register a claim to a visual work. According to the application, an artificial-intelligence machine autonomously generated the work without human involvement.

The Copyright Office denied Dr. Thaler's application because the work lacked human authorship. After an unsuccessful administrative appeal, Dr. Thaler filed this suit, alleging that the Copyright Office should not have applied a human-authorship requirement. The district court granted summary judgment to the government.

This Court should affirm. The Copyright Office correctly denied the application here because human authorship is a basic prerequisite to copyright. That conclusion reflects a straightforward application of the statutory text, history, and precedent.

The Copyright Act's plain text and structure establish a human-authorship requirement. The statutory lifecycle for a copyright—from its creation to its (potential) conveyance, duration, and renewal—show that copyrighted works must have a human author. For example: when a copyrighted work is created, its exclusive rights and ownership vest in the author; when a copyright is licensed or extended, the remaining rights belong either to the author or the author's family; and when a copyright expires, it generally does so based on the number of years since the author's death. Even when Congress deviated from these rules, it enacted provisions requiring that the person who created the work have capacity to enter employment arrangements and binding agreements. These provisions would be nonsensical were they applied to a machine. As Dr. Thaler concedes, a machine lacks legal rights; has no family, birth, or death; and cannot execute contracts.

Precedent confirms the human-authorship requirement. Since the 19th century, the Supreme Court has recognized human creativity as the touchstone of authorship. Other circuit courts have rejected efforts to claim copyright in works allegedly authored by nonhumans. And the Copyright Office, in turn, has consistently stated its agreement with these views.

Dr. Thaler offers no sound reason to depart from these bedrock principles. Instead, he cites statutory provisions that support the judgment below,

2

takes positions he disclaimed before the agency, and urges the Court to weigh in on a policy debate properly resolved by Congress, not the judiciary.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this Administrative Procedure Act suit pursuant to 28 U.S.C. § 1331. After the district court granted summary judgment on all claims to the government on August 18, 2023, JA 184, plaintiff timely appealed on October 11, 2023, JA 203; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the Copyright Office correctly declined to register a claim to copyright in a work that lacks human authorship.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background.

**1.**    The Constitution grants Congress power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and

Discoveries." U.S. Const. art. I, § 8, cl. 8. Congress has exercised that authority throughout the Nation's history. The first Congress enacted the Copyright Act of 1790 to provide copyright protection to the "author or authors" of certain works. Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124, 124.

Today, the Copyright Act of 1976 similarly states that protection subsists "in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The Supreme Court has explained that, to satisfy the Act's requirement of "original[ity]," *id.*, a work must be "independently created by the author (as opposed to copied from other works)" and "possess[] at least some minimal degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

As a general rule, copyright in a work protected under the Copyright Act "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). When a copyrighted work is created, the statute confers on the author certain "exclusive rights" in it, such as the rights to copy the work or prepare derivative works. *Id.* § 106.

The Act's provisions regarding duration of copyright protection generally rely on the time of the author's life and death. For works created after 1977, copyright "endures for a term consisting of the life of the author and 70 years after the author's death." 17 U.S.C. § 302(a). For a "joint work

4

prepared by two or more authors," protection endures for "the life of the last surviving author and 70 years after such last surviving author's death." *Id.* § 302(b). And for certain works, the Act permits a "renewal and extension" of copyright protection. 17 U.S.C. § 304(a)(1)(C). The parties entitled to such an extension include "the author of such work, if the author is still living," *id.* § 304(a)(1)(C)(i); "the widow, widower, or children of the author, if the author is not living," *id.* § 304(a)(1)(C)(ii); or, if the author died without a will, "the author's next of kin," *id.* § 304(a)(1)(C)(iii)–(iv).

Any person with a copyright interest may "record in the Copyright Office a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date." *Id.* § 302(d). If recorded documents and certain other sources "disclose nothing to indicate that the author of the work is living" after a certain period, then the Copyright Act creates a "presumption that the author" is "dead." *Id.* § 302(e).

The Act also includes provisions specific to a copyrighted "anonymous work," "pseudonymous work," or "work made for hire." 17 U.S.C. §§ 101, 302(c). For an "anonymous work" (where "no natural person is identified as author") or a "pseudonymous work" (where the "author is identified under a fictitious name"), *id.* § 101, copyright lasts either "95 years from the year of its first publication" or "120 years from the year of its creation, whichever

5

expires first," *id.* § 302(c). But if an unknown author's identity is revealed during the copyright term, then the remaining duration is measured "based on the life of the author or authors whose identity has been revealed." *Id.*

A "work made for hire" is either "(1) a work prepared by an employee within the scope of his or her employment" or, for certain types of works, "(2) a work specially ordered or commissioned ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. If a work made for hire is otherwise copyrightable, then "the employer" or commissioning party "is considered the author," and, "unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* § 201(b). Copyright in a work made for hire lasts for a default term of "95 years from the year of its first publication" or "120 years from the year of its creation, whichever expires first." *Id.* § 302(c).

Ownership of a copyright or any of its exclusive rights may be transferred or licensed "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). A transfer of ownership or exclusive license, however, "is not valid" unless it is "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Id.* §§ 101, 204(a).

6

The Copyright Act also generally provides that authors may terminate transfers or licenses that they had previously executed. *See* 17 U.S.C. § 203 (governing post-1977 transfers and licenses); *id.* § 304(c)–(d) (pre-1978). Specifically, for works "other than a work made for hire," the author may "effect[]" the "termination of the grant" of a transfer or license by timely serving "advance notice" in a "writing[] signed by" the author. *Id.* § 203(a). Upon termination, "all rights under [the Copyright Act] that were covered by the terminated grants revert to the author." *Id.* § 203(b). If the "author is dead," however, "his or her termination interest is owned, and may be exercised," by the deceased author's "widow or widower" or "surviving children" or "grandchildren." *Id.* § 203(a)(2); *see also id.* § 304(c)–(d) (setting similar rules for pre-1978 transfers and licenses). The Act defines "a person's 'children'" as "that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person." *Id.* § 101. It defines a "widow" and "widower" as "the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried." *Id.*

**2.**    Copyright claimants may apply to register their claims with the United States Copyright Office. *See* 17 U.S.C. §§ 408–412, 701–702. To apply for registration of a published work, a claimant must submit a copy or copies

of the work (or phonograph(s) where applicable), an application including information about the work, and an application fee. *Id.* §§ 408(a)–(b), 409, 708. The Copyright Office determines whether the work "constitutes copyrightable subject matter" and whether "the other legal and formal requirements of [the Copyright Act] have been met." *Id.* § 410(a). If the application meets those requirements, the registration is granted and the Copyright Office provides the claimant with a certificate of registration. *See id.* If the Copyright Office instead determines that the work "does not constitute copyrightable subject matter or that the claim is invalid for any other reason," it "shall refuse registration." *Id.* § 410(b). The Copyright Act imposes fines if an applicant knowingly makes a materially false factual representation in the application. *Id.* § 506(e).

Although "registration is not a condition of copyright protection," 17 U.S.C. § 408(a), it affords certain benefits that copyright ownership alone does not. A copyright claimant of a United States work generally may not sue for infringement unless the claimant first obtains a registration or the Copyright Office denies the claimant's registration application (in which case the government can intervene on the issue of registrability). *Id.* § 411(a); *see generally Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886 (2019). Registration before the infringement occurs may also be a

8

prerequisite to certain monetary remedies. 17 U.S.C. §§ 412, 504–505. A certificate of registration can also be prima facie evidence of copyright validity. *Id.* § 410(c). A registration may not be used as a prerequisite to filing suit, however, if the applicant knowingly provided the Copyright Office with inaccurate registration information that, "if known, would have caused" the agency "to refuse registration." *Id.* § 411(b)(1)(A); *see Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 187–88 (2022) (requiring that the applicant "was actually aware of, or willfully blind to" the inaccurate information).

**3.**    The Copyright Act also authorizes the Copyright Office to "establish regulations not inconsistent with law for the administration of the functions and duties" assigned under Act. 17 U.S.C. § 702. Under that authority, the agency has promulgated regulations regarding "conditions for the registration of copyright." 37 C.F.R. § 202.3(a)(1).

Those regulations permit applicants to seek "administrative review" of decisions denying their applications. 37 C.F.R. § 202.5(a). Specifically, a party whose application has been denied may seek "[f]irst reconsideration" from the Copyright Office's Registration Program. *Id.* § 202.5(b). If that proves unsuccessful, the applicant may then seek "[s]econd reconsideration" from the Copyright Office Review Board. *Id.* § 202.5(c), (f). The Review

9

Board's decision on second reconsideration "constitutes final agency action." *Id.* § 202.5(g); *see* 17 U.S.C. § 701(e).

**4.**     The Copyright Office also issues guidance concerning the registration process and its requirements, including in the *Compendium of Copyright Office Practices*.  The *Compendium* is a publicly available manual that the Copyright Office periodically updates. The current version of the *Compendium*, which was published in the *Federal Register* in 2021, underwent notice and comment before its publication. *See* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* (3d. ed. 2021), https://perma.cc/9N9N-C3VU (*Compendium (Third)*); *see also* 86 Fed. Reg. 3205 (Jan. 14, 2021).

The *Compendium* reflects the agency's longstanding view that copyright requires human authorship. It states that the Copyright Office "will refuse to register a claim if it determines that a human being did not create the work." *Compendium (Third)* § 306; *see also id.* (explaining that copyright protects only "the fruits of intellectual labor" that "are founded in the creative powers of the mind" (quoting *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879))); *id.* § 313.2 ("To qualify as a work of 'authorship' a work must be created by a human being. Works that do not satisfy this requirement are not copyrightable." (citing *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53,

10

58 (1884))). The *Compendium* offers examples of works lacking the requisite human authorship, including "works produced by nature, animals, or plants." *Id.* § 313.2. It further explains that the Copyright Office "will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author." *Id.*

The Copyright Office has expressed consistent views on the human-authorship requirement since before the current Copyright Act was enacted in 1976. In 1966, the agency's annual report noted a "crucial question" for works created with "computer technology": "whether the 'work' is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional elements of authorship in the work … were actually conceived and executed not by man but by a machine." U.S. Copyright Office, *Sixty-Eighth Annual Report of the Register of Copyrights for the Fiscal Year Ending June 30, 1965*, at 5 (1966), https://perma.cc/QU7P-TY6N.

Similarly, in the first edition of the *Compendium*, published in 1973, the agency stated that it would not register materials that did not "owe their origin to a human agent." U.S. Copyright Office, *Compendium of Copyright Office Practices* § 2.8.3(I)(a)(1)(b) (1st ed. 1973), https://perma.cc/J7ML-BZK6 (*Compendium (First)*); *see also* U.S. Copyright Office, *Compendium*

11

*of Copyright Office Practices* § 202.02(b) (2d ed. 1984), https://perma.cc/52MX-6YPD (*Compendium (Second)*) ("The term 'authorship' implies that, for a work to be copyrightable, it must owe its origin to a human being. Materials produced solely by nature, by plants, or by animals are not copyrightable.").

In March 2023, the Copyright Office reiterated these views in published guidance concerning works containing AI-generated material. *See Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence*, 88 Fed. Reg. 16,190 (Mar. 16, 2023). The guidance explains that, consistent with the Copyright Office's longstanding approach, the agency "will consider whether the AI contributions are the result of 'mechanical reproduction' or instead of an author's 'own original mental conception, to which the author gave visible form.'" *Id.* at 16,192 (alteration omitted) (quoting *Sarony*, 111 U.S. at 60). Generally speaking, the latter can give rise to a valid copyright while the former cannot. *See id.* The guidance also states that "applicants have a duty to disclose the inclusion of AI-generated content in a work submitted for registration and to provide a brief explanation of the human author's contributions to the work." *Id.* at 16,193.

The March 2023 guidance emphasizes that the Copyright Office continues to take "a case-by-case" approach to determining whether works

12

containing AI-generated material reflect sufficient human authorship. 88 Fed. Reg. at 16,192. If "a work's traditional elements of authorship were produced by a machine" and a human user "d[id] not exercise ultimate creative control," then "the work lacks human authorship" and the Copyright Office "will not register it." *Id.* But "[i]n other cases," a "work containing AI-generated material will also contain sufficient human authorship to support a copyright claim," such as when a human "select[s] or arrange[s] AI-generated material" in a creative way. *Id.* In these respects, the Copyright Office recognizes that artificial intelligence can be a creative tool like many others at an artist's disposal—such as the sound effects made possible by electric "guitar pedals." *Id.* at 16,193. "In each case," the guidance adds, "what matters is the extent to which the human had creative control over the work's expression." *Id.*

The Copyright Office has a statutory duty to "[a]dvise Congress on national and international issues relating to copyright" and "related matters." 17 U.S.C. § 701(b)(1); *see also id.* § 701(b)(4) (instructing the agency to "[c]onduct studies and programs regarding copyright"). To that end, the Copyright Office recently sought public input regarding the law and policy issues raised by artificial intelligence and copyright. *See Artificial Intelligence and Copyright*, 88 Fed. Reg. 59,942 (Aug. 30, 2023) (notice of inquiry

13

and request for comments). The agency received and is reviewing more than 10,000 comments.

### B.   Factual Background.

This case concerns the Copyright Office's refusal to register Dr. Stephen Thaler's copyright claim to an image generated by artificial intelligence. In his registration application, Dr. Thaler stated that the work "was autonomously created by a computer algorithm running on a machine called the 'Creativity Machine,'" and that Dr. Thaler was "seeking to register this computer-generated work as a work-for-hire to the owner of the Creativity Machine." JA 42.[1] The application listed the "Creativity Machine" as the work's "Author" and repeated that the "2-D artwork" at issue was "[c]reated autonomously by machine." JA 43. The application further identified Dr. Thaler as the copyright owner by virtue of his "[o]wnership of the machine" that authored the artwork. JA 43.

The Copyright Office denied the application. JA 45–46. Noting Dr. Thaler's many representations that he played no role in creating the work,

---

[1] Throughout this case, Dr. Thaler has interchangeably referred to the putative author as the "Creativity Machine," "artificial intelligence," an "AI system," a "computer algorithm," and a "machine." *E.g.*, Br. 1, 5–6; JA42–43. This brief likewise treats those terms as fungible.

the agency explained by letter that the work "lacks the human authorship necessary to support a copyright claim." JA 45–46.

Dr. Thaler sought reconsideration through the Copyright Office's Registration Program. JA 49–56; *see* 37 C.F.R. § 202.5. He conceded "that the present submission lacks traditional human authorship" because "it was autonomously generated by an AI." JA 49. In Dr. Thaler's view, however, "the Human Authorship Requirement" was "unsupported by either statute or case law." JA 49.[2] Dr. Thaler emphasized that "machines are able to autonomously generate creative works, and to functionally automate human creativity," JA 54, and he posited various policy reasons to register copyrights for computer-generated works, *e.g.*, JA 50.

The first reconsideration request was denied. JA 59–60. The agency repeated that it "will not register works produced by a machine or mere mechanical process that operates randomly or automatically without sufficient creative input or intervention from a human author." JA 59. And because Dr. Thaler had consistently represented that "the Work here was 'autonomously

---

[2] In his request for reconsideration to the agency, Dr. Thaler stated that a human-authorship requirement was unconstitutional. JA 49. In federal court, however, Dr. Thaler has not pressed any independent constitutional claim. Rather, he references general constitutional principles to support his statutory arguments. *E.g.*, Br. 31.

generated by an AI'" without offering any "evidence on sufficient creative in-put or intervention by a human author in the Work," the Copyright Office explained that the work could not "sustain a claim in copyright" under the agency's "longstanding interpretation" of controlling law. JA 59.

Dr. Thaler sought second reconsideration from the Copyright Office Review Board on the same grounds as his first request. JA 63–70. The Re-view Board denied that request in a formal written decision. JA 71–77; *see* 37 C.F.R. § 202.5(c). It explained that "the only issue" presented was Dr. Thaler's challenge to "the [Copyright] Office's human authorship require-ment." JA 73. The Review Board also emphasized that "[Dr.] Thaler does not assert that the Work was created with contribution from a human author" and did not "raise[] this as a basis for registration." JA 73 & n.3. Accordingly, there was no occasion to decide whether, or "under what circumstances," "human involvement in the creation of machine-generated works would meet the statutory criteria for copyright protection." JA 73 n.3. The Review Board then rejected Dr. Thaler's legal arguments on the merits, JA 73–77, and observed that "[m]uch of [Dr.] Thaler's" submission "amounts to a policy argument" unsupported by legal citations, JA 77.

**C.    Prior Proceedings.**

Dr. Thaler filed suit against the Copyright Office and the Register of Copyrights, bringing a single count under the Administrative Procedure Act. *See* JA 21–39 (corrected complaint). The complaint alleged that "requiring human authorship for registration of copyright in a work is contrary to law," JA 38, ¶ 63, and that the Copyright Office's refusal to grant his application was unlawful, JA 39, ¶ 65. For relief, the complaint sought an order "compelling Defendants to set aside their refusal to register the Work." JA 39.

The district court granted summary judgment to the government and denied Dr. Thaler's cross-motion. JA 184; JA 185–199. At the outset, the district court observed that Dr. Thaler had intentionally implicated a narrow legal issue: "By design in plaintiff's framing of the registration application," the court explained, "the single legal question presented here is whether a work generated autonomously by a computer falls under the protection of copyright law upon its creation." JA 190; *see* JA 191 n.1. The court rejected Dr. Thaler's "attempts to ... assert[] new facts" for the first time in litigation— including Dr. Thaler's assertions that he exercised control "in generating the work"—because they "directly contradict[ed]" both the administrative record and Dr. Thaler's representations to the agency that he had played no part in the work's creation. JA 197; *see* JA 198 (explaining that the Copyright Office

17

had relied on Dr. Thaler's representations that he had "played no role in us-ing the AI to generate the work, which [Dr. Thaler] never attempted to cor-rect"). Thus, the "only question" the court considered was whether Dr. Thaler could register "a work generated absent human involvement." JA 191.

On that discrete question, the district court concluded that statutory text, judicial precedent, and the administrative record all supported the Copy-right Office's decision not to register a copyright "[i]n the absence of any human involvement in the creation of the work." JA 198.

## SUMMARY OF ARGUMENT

The text and structure of the Copyright Act evince Congress's view that the author of a protected work must be human, not machine. From a copy-right's beginning to its end, the Act presumes that a human created the work. The statute automatically vests exclusive rights and ownership in the author. It measures a copyright's term by the author's natural life and death. Several sections reference an author's family or heirs. Still others assume an author's ability to execute employment arrangements and legal contracts. These pro-visions plainly contemplate an author's humanity. And they would be non-sensical if they applied to a "machine" that—as Dr. Thaler concedes—has no legal rights, no life or death, no family, and no legal capacity to be an em-ployee or to enter binding agreements.

18

The human-authorship requirement also comports with precedent stretching to the 19th century. The Supreme Court has long viewed human creativity as the touchstone of authorship, and circuit courts have concluded that nonhuman authors are not entitled to copyright protection. The Copyright Office has consistently maintained (and publicized) these same views since before the current Copyright Act took effect. And there is no indication that Congress intended to depart from that settled view when it reenacted the pre-existing authorship standard in the current Act.

Dr. Thaler offers no basis to upend these well-established principles. Instead, Dr. Thaler invokes statutory text that bolsters the district court's conclusions, proffers facts that he already disclaimed, and describes debatable policy arguments that are properly directed to Congress, not the judiciary.

Because the Copyright Office properly rejected an application that, on its face, acknowledged that the relevant work lacked the human authorship required for copyright protection, this Court should affirm.

## STANDARD OF REVIEW

The Court reviews the grant of summary judgment de novo. *Sandoz Inc. v. Becerra*, 57 F.4th 272, 277 (D.C. Cir. 2023). A reviewing court must

19

uphold an agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## ARGUMENT

### THE COPYRIGHT OFFICE PROPERLY DENIED PLAINTIFF'S APPLICATION TO REGISTER A COPYRIGHT FOR A WORK LACKING HUMAN AUTHORSHIP

Under the Copyright Act, only "original works of authorship" are eligible for copyright protection. 17 U.S.C. § 102(a); *see Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021). This case concerns whether the original-work-of-authorship requirement means that copyrightable works must be created by a human author.

The Copyright Act's text and structure confirm that it does. That straightforward conclusion is consistent with a century of statutory history and case law, and with the Copyright Office's longstanding interpretation.

### A. Copyright protection requires human authorship.

#### 1. The plain text of the Copyright Act confirms that an author is human.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). Although the Copyright Act does not separately define the term "author," the Supreme Court has recognized "[a]s a general rule" that "the

author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). The Copyright Act's text and structure make clear that an author must be human, not machine.

      **a.**     The Copyright Act provisions governing a copyright's lifecycle—including its creation, conveyance, duration, and renewal—show that a human must be involved in authoring the work.

      The Act's treatment of copyright creation presumes that authors are human. Under the Act, "[c]opyright protection subsists" upon an original work of authorship's creation and fixation in a tangible medium. 17 U.S.C. § 102(a). Copyright "vests initially in the author or authors of the work." *Id.* § 201(a). These statutory provisions necessarily exclude a machine: As Dr. Thaler concedes, his machine lacks legal capacity to hold the rights that the statute confers on authors. For example, he admitted to the agency that "machines do not have legal personality and cannot own property," JA 51; he alleged in district court that "[a]n AI is not a legal person and does not have rights" and that "[i]t is therefore not possible for an AI to 'own' intellectual property," JA 34, ¶ 46; and he acknowledges on appeal that a machine

21

"cannot have legal rights or obligations such as ownership of intellectual property rights," Br. 43.

The Copyright Act's treatment of copyright transfers and licenses similarly shows than an author cannot be a machine. A transfer or license "is not valid" unless it is "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). By the same token, and except for works "made for hire," an author may terminate his or her prior "grant of a transfer or license" by timely serving a "signed" "writing" on the grantee. *Id.* § 203(a).[3] An author's right to terminate persists "notwithstanding any agreement to the contrary," *id.* § 203(a)(5), and ensures that "all rights ... covered by the terminated grants revert to the author," *id.* § 203(b); *see also id.* § 304(c)–(d) (similar). These terms make clear that a machine cannot be an "author" under the Copyright Act because a machine lacks capacity to enjoy and execute these statutory rights.

Further confirming that an author must be human, the Copyright Act states that the rights to terminate transfers and licenses pass to the author's family upon death. If the "author is dead, his or her termination interest is owned, and may be exercised," by the deceased author's "widow or widower,"

---

[3] As explained below (at 25–27), the work-made-for-hire doctrine does not apply here and itself shows that authors are humans, not machines.

"surviving children," or "grandchildren." 17 U.S.C. § 203(a)(2); *see also id.* § 304(c)–(d). In these ways, the statute again equates an "author" with a natural person. It defines "widow" and "widower" as "the author's surviving spouse under the law of the author's domicile at the time of his or her death," and "[a] person's 'children'" as "that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person." *Id.* § 101. A machine cannot give effect to any of these statutory terms.

The statutory text specifying how to calculate a copyright's duration likewise confirms the human-authorship requirement. For one thing, the Copyright Act generally measures the period of protection by the author's "life" and "death." 17 U.S.C. § 302(a). Subject to certain exceptions (discussed *infra* pp. 25–27), copyright "endures for a term consisting of the life of the author and 70 years after the author's death." *Id.* Similarly, for a "joint work prepared by two or more authors who did not work for hire," copyright lasts for "the life of the last surviving author" plus "70 years after such last surviving author's death." *Id.* § 302(b).

For another, the Copyright Act allows persons with "an interest in a copyright" to submit to the agency "a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date." 17 U.S.C. § 302(d). Depending on what those

23

statements say, the Copyright Act can create a "presumption that the author has been dead for at least 70 years," which provides a "complete defense to any action for infringement." *Id.* § 302(e). To register a copyright claim, moreover, the applicant must generally state "the name and nationality or domicile of the author or authors, and, if one or more of the authors is dead, the dates of their deaths." *Id.* § 409(2). Each of these provisions concerning life, death, and nationality presume that an author is human; they would be meaningless were the "author" a machine.

The Act's terms addressing copyright renewals would be equally empty without a human-authorship requirement. For certain works, the Act provides for a "renewal and extension" of copyright protection. 17 U.S.C. § 304(a)(1)(C). The parties entitled to such an extension are necessarily human. They include "the author of such work, if the author is still living," *id.* § 304(a)(1)(C)(i); "the widow, widower, or children of the author, if the author is not living," *id.* § 304(a)(1)(C)(ii); or, if the author died without a will, "the author's next of kin," *id.* § 304(a)(1)(C)(iii)–(iv).

Accepting a machine as the "author" of a copyrighted work would twist the statute into knots. As noted above, a machine does not have a "life" or "death" against which a copyright term could be measured. 17 U.S.C. § 302(a). Thus, if a machine were allowed to be a work's author, then the

24

copyright in that work would extend in perpetuity, flouting a foundational rule of copyright law: that copyright terms must eventually end. *See* U.S. Const. art. I, § 8, cl. 8 (demarcating "limited Times" for protection); *Eldred v. Ashcroft*, 537 U.S. 186, 208–10 (2003) (observing that "limited Times" under the Copyright Clause cannot be "perpetual"); *see also Jones v. Hendrix*, 599 U.S. 465, 478 (2023) (noting "[b]asic principles of statutory interpretation" to avoid setting a statute "at cross-purposes" with itself).

**b.** Dr. Thaler invokes (Br. 24–27) other parts of the Copyright Act—those concerning anonymous works, pseudonymous works, and works made for hire—but each one reinforces a human-authorship requirement.

Dr. Thaler's reliance on the provisions concerning "anonymous" and "pseudonymous" works, *see* 17 U.S.C. § 302(c), establishes only the unremarkable point that a work need not have an *identified* human author. But that does not mean that the work need not have a human author at all.

Indeed, the provision for anonymous works confirms that authors must be human. An "anonymous" work is one where "no natural person is identified as author." 17 U.S.C. § 101. The Act provides that, whenever the author's identity is uncovered before the copyright expires, the remaining term is "based on the life of the author or authors whose identity has been revealed," *id.* § 302(c), thus precluding the possibility of an anonymous work

25

whose author is identified at the outset. The provision makes sense only if it is taken as a given that a natural person is the work's author, and the work is anonymous if that natural person has not been identified.

For similar reasons, Dr. Thaler does not advance his argument by invoking the work-made-for-hire doctrine. *See* 17 U.S.C. §§ 201(b), 302(c). The doctrine allows employers and proprietors—including nonhuman entities like corporations—to be "considered the author" of a copyrighted work by operation of law. *Id.* § 201(b). But it does not mean that Congress contemplated that nonhuman entities could actually be the "authors" of a work, as opposed to merely being "considered the author."

The provision's operation further confirms that the actual creator of the work must be a human. The work either must either be "prepared by an employee within the scope of his or her employment" or (for certain types of works) it must be "specially ordered or commissioned" through an agreement between the hirer and the artist "in a written instrument signed by them." 17 U.S.C. § 101. Each of these possibilities presumes that the actual preparer of the work is a human.

"Employees" are humans. It would be most unnatural to describe a machine used to create a work as an "employee." And there is every indication that Congress did not adopt that unnatural meaning. In describing a

26

qualifying "employee" under the work-made-for-hire doctrine, Congress used personal pronouns. 17 U.S.C. § 101 (defining the doctrine as involving "a work prepared by an employee within the scope of *his or her* employment" (emphasis added)). And the Supreme Court has held that the Act's references to an "employee" also incorporate "principles of general common law of agency," *Reid*, 490 U.S. at 743, 751, which implicates a relationship with a natural person, not a machine.

The Copyright Act's special treatment of commissioned works similarly presumes that the creator is human. For a commissioned work, the Act requires an agreement memorialized in a "signed" "written instrument." 17 U.S.C. § 101 (defining "'work made for hire'"); *see also id.* § 201(b) (referring to an "express[]" "written instrument signed by" the parties). That contracting obligation again excludes a machine because (unlike a human) a machine lacks legal capacity to enter binding agreements. *See, e.g.*, JA 37, ¶ 56 (alleging that "an AI is neither a legal employee nor an independent contractor capable of executing a contract"); Br. 43 (similar); JA 76–77 (agency decision noting same deficiencies).

    **c.**    The analysis above, and the agency and district court conclusions in this case, are consistent with over a century of statutory history. For example, the Copyright Act of 1909 extended copyright protection to an

27

author's "widow," "widower," "children," and "next of kin," Pub. L. No. 60-349, § 23, 35 Stat. 1075, 1080, which denoted that authors were human. There is no indication that Congress intended to override this established understanding in the Copyright Act of 1976. Like the 1909 Act, the 1976 Act is replete with provisions that make no sense unless authors are human. And the legislative history confirms that Congress intended to carry forward the "authorship" standard "without change" when it enacted the Copyright Act of 1976.  H.R. Rep. No. 94-1476, at 51 (1976).

### 2. Judicial precedent supports the human-authorship requirement.

**a.** Since at least the 19th century, the Supreme Court's copyright case law has underlined that authorship depends on human involvement in creating the work.

The seminal decision is *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). There, the Supreme Court held that Congress' authority to enact legislation protecting the "Writings" of "Authors," U.S. Const. art. I, § 8, cl. 8, allowed it to extend copyright protection to photographs, *see* Act of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212; Act of March 3, 1865, ch. 126, § 1, 13 Stat. 540, 540.

That holding hinged on human authorship. To warrant copyright protection, the Court concluded, photographs must be "representatives of

original intellectual conceptions of the author." *Sarony*, 111 U.S. at 58. The photograph at issue in *Sarony* (a portrait of Oscar Wilde) qualified for copyright protection due to the human photographer's creative choices. *See id.* at 60 (detailing decisions such as "posing the [subject] in front of the camera, selecting and arranging the costume, draperies, and other various accessories," and "arranging the subject so as to present graceful outlines" and "evoking the desired expression" (quotation marks omitted)). Because the photograph was "the product of" the photographer's "intellectual invention," the Supreme Court deemed it "an original work of art[] … of which [the photographer] is the author." *Id.* In short, human input in (and creative control over) the work drove the Court's conclusion that copyright could attach.

Dr. Thaler acknowledges *Sarony* but does not follow it to its logical conclusion that an "author" is human. In particular, Dr. Thaler asserts (Br. 29) that the "[p]hotographic technology" in *Sarony* "mirrors, in many ways, the development and use of AI" because "[b]oth can be thought of as creative tools." But nothing in *Sarony* suggested that a device itself can be an "author" for copyright purposes. Rather, the Supreme Court contrasted the "merely mechanical" use of a device lacking "novelty, invention, or originality" with "an original work of art" that is "the product of [the photographer's] intellectual invention, of which plaintiff is the author." *Sarony*, 111 U.S. at 59–60;

29

*see also id.* at 58 (describing copyright as "the exclusive right of a man to the production of his own genius or intellect"). Just as the user (or manufacturer) of the camera in *Sarony* could not have claimed the camera itself as the "author" of any photograph captured with it, *see id.* at 60–61, Dr. Thaler cannot claim his machine as the "author" of any image "autonomously" generated by it, JA 42; *see also, e.g.*, *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) (describing copyright as protecting works "founded in the creative powers of the mind"). *Sarony* instead shows that, even as humans channel their creativity through new devices and technologies, authorship remains a human enterprise.

**b.** Federal courts of appeals have consistently rejected efforts to obtain copyright in works allegedly authored by nonhumans.

The Seventh Circuit has unequivocally held that "'authorship is an entirely human endeavor'" and that "[a]uthors of copyrightable works must be human." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 304 (7th Cir. 2011) (quoting 2 William F. Patry, *Patry on Copyright* § 3.19 (2010), Westlaw (database updated Sept. 2023)) (citing *Compendium (Second)* §§ 202.02(b), 503.03(a)). Dr. Thaler dismisses *Kelley* because it involved claims under 17 U.S.C. § 106A—a section granting authors of works of visual art additional rights. *See* 635 F.3d at 292. But that supposed distinction is immaterial

30

because, to assess claims under § 106A, the Seventh Circuit explicitly considered whether the work at issue met the Copyright Act's authorship requirement in the first instance. *Id.* at 302. Equally irrelevant is Dr. Thaler's observation (Br. 41–42) that the Seventh Circuit rejected efforts to copyright a work shaped by nonhuman "forces of nature," as opposed to images generated by nonhuman artificial intelligence. There is no principled basis for Dr. Thaler's preferred (and outcome-oriented) carveout for his machine.

The Ninth Circuit also recognizes that copyright law requires human authorship in creating a protectable work. In *Urantia Foundation v. Maaherra*, 114 F.3d 955 (9th Cir. 1997), the court rejected an applicant's contention that copyright extends to works authored by "celestial beings rather than human beings." *Id.* at 958. Dr. Thaler stresses (Br. 40) that the Ninth Circuit had observed that no single provision of the Copyright Act "expressly" says that an author is "human" and that questions "over the copyrightability of computer-generated works" had caused "considerable controversy." *Urantia Found.*, 114 F.3d at 958 (quotation marks omitted). But that is beside the point. The Ninth Circuit held that, for the work at issue to be "copyrightable," "some element of human creativity must have occurred." *Id.* In other words, the kind of human creativity that Dr. Thaler's application

31

expressly disclaimed is, under Ninth Circuit precedent, a prerequisite to protection.

The Ninth Circuit reiterated the human-authorship requirement in *Naruto v. Slater*, 888 F.3d 418 (9th Cir. 2018). There, the court concluded that an animal claimed to be "the author and owner" of certain photographs, *id.* at 424, could not sue for infringement under the Copyright Act because animals "are not human," *id.* at 420, 425–26. Dr. Thaler attempts to cabin that case to questions of standing, Br. 41, but the Ninth Circuit held that the Copyright Act protects humans, not nonhumans, as evinced by its authorship provisions concerning an author's "children," "widow," "grandchildren," and "widower"—terms that "all imply humanity and necessarily exclude animals that do not marry and do not have heirs entitled to property by law," *Naruto*, 888 F.3d at 426. This conclusion applies with equal force whether applied to a nonhuman animal or a nonhuman machine.

### 3. The Copyright Office has consistently interpreted the Copyright Act to require human authorship with Congress' approval.

The plain statutory text and structure are sufficient to affirm. But insofar as Dr. Thaler relies on any ambiguity in the Copyright Act here, *see* Br. 30–31, the Copyright Office's longstanding view is persuasive. This is especially so because Congress has acquiesced in that settled understanding.

32

The Copyright Office's views on human authorship predate the Copyright Act of 1976. In the agency's annual report published in 1966, the Copyright Office recognized that "[t]he crucial question" for works created with "computer technology" is "whether the 'work' is basically one of human authorship." *Sixty-Eighth Annual Report of the Register of Copyrights for the Fiscal Year Ending June 30, 1965*, *supra*, at 5. In those respects, the agency explained, a work could qualify if "the computer merely [was] an assisting instrument," but would be ineligible if "the traditional elements of authorship in the work … were actually conceived and executed not by man but by a machine." *Id.* Similarly, in the first edition of the *Compendium of Copyright Office Practices*, published in 1973, the agency stated that "it is not possible to claim copyright in" materials that do not "owe their origin to a human agent." *Compendium (First)* § 2.8.3(I)(a)(1)(b).

When Congress enacted the Copyright Act of 1976 and incorporated the pre-existing "authorship" standard "without change," H.R. Rep. No. 94-1476, at 51, it did not upend the Copyright Office's well-settled interpretation of that standard. To the contrary, precisely because those views were axiomatic, the proper inference is that Congress intended the concept of authorship "to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *see also id.* at 645

33

("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). Congress, moreover, granted the Copyright Office broad authority to administer the copyright registration system, 17 U.S.C. § 701, and has not amended the Copyright Act's authorship requirement despite amending other aspects of the statute, *see, e.g.*, *id.* § 106A (extending additional rights to authors of works of visual art).

The Copyright Office has consistently maintained its views regarding human authorship. In the second edition of the *Compendium*, published in 1984, the agency repeated that "[t]he term 'authorship' implies that, for a work to be copyrightable, it must owe its origin to a human being." *Compendium (Second)* § 202.02(b). Today's version of the *Compendium* is materially similar: It explains that the Copyright Office "will refuse to register a claim if it determines that a human being did not create the work" because copyright law protects only "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *Compendium (Third)* § 306 (quoting *Trade-Mark Cases*, 100 U.S. at 94); *see also id.* § 313.2 ("To qualify as a work of 'authorship' a work must be created by a human being. Works that do not

34

satisfy this requirement are not copyrightable." (citing *Sarony*, 111 U.S. at 58)).

The Copyright Office applies these stated rules in the context of AI-generated works. In evaluating applications to register "works containing AI-generated material," the Office "considers whether the AI contributions are the result of 'mechanical reproduction' or instead of an author's 'own original mental conception, to which the author gave visible form.'" 88 Fed. Reg. at 16,192 (alteration omitted) (quoting *Sarony*, 111 U.S. at 60). The Copyright Office's enduring views are also reflected in formal written decisions, including letters responding to Dr. Thaler's administrative appeals. *See* JA 59–60; JA 71–77.

Dr. Thaler offers no persuasive reason to depart from this unbroken line of agency understanding and congressional endorsement. As the Copyright Office explained in denying Dr. Thaler's application and appeals, the statutory text and structure, centuries of statutory history and case law, and agency practice all point to the same conclusion: the Copyright Act requires human authorship. Dr. Thaler, by contrast, "can point to no case in which a court has recognized copyright in a work originating with a non-human." JA 196.

### B.    Plaintiff's contrary arguments lack merit.

Dr. Thaler challenges the agency and district court decisions on various grounds. Each argument defies the statutory text, his prior concessions, or both.

1.    Dr. Thaler principally contends that he entitled to registration because his machine is "a device created and operated by" him and that therefore Dr. Thaler is the work's "author and copyright owner either through the work for hire doctrine or his control of his AI system." Br. 44–45. These assertions falter at every step.

To begin, the work-made-for-hire doctrine does not apply here because the relevant statutory provisions presume that a human created the work. *See* 17 U.S.C. §§ 101, 201(b); *supra* pp. 25–27. Dr. Thaler's reliance on the doctrine instead highlights that no copyright doctrine vests ownership of the work in him unless he (or another human) actually created that work.

In all events, the factual record forecloses any reliance on the work-made-for-hire doctrine here. Dr. Thaler admits that his machine is not (and cannot be) his employee, and that it did not (and cannot) execute a written contract for commission. Specifically, Dr. Thaler conceded before the agency that "machines do not have legal personality," JA 51, alleged in the complaint that "an AI is neither a legal employee nor an independent contractor capable

36

of executing a contract," JA 37, ¶ 56, and restates on appeal that his machine "cannot have legal rights or obligations," Br. 43. Thus, Dr. Thaler cannot satisfy the statute's basic requirements that the work be "prepared by an employee within the scope of his or her employment" or "specially ... commissioned" through an express written agreement signed by the artist. 17 U.S.C. § 101 (defining "work made for hire").

Equally unpersuasive is Dr. Thaler's contention (Br. 56-58) that the Copyright Office should have granted registration because he allegedly authored the work himself. The Court should reject this argument because Dr. Thaler explicitly disclaimed it to the agency. Contrary to his position here, Dr. Thaler stated throughout his registration application that the work "was autonomously created by a computer algorithm running on a machine." JA 42; *see* JA 43 (repeating that the work was "[c]reated autonomously by machine"). And far from suggesting that Dr. Thaler was the author himself—in whom copyright would have "vest[ed] initially," 17 U.S.C. § 201(a)—the application asserted that copyright should "[t]ransfer" from the machine to Dr. Thaler because he "[o]wne[d]" the property that actually authored the work. JA 43. In his administrative appeals, moreover, Dr. Thaler reiterated that

"the present submission lacks traditional human authorship" and instead "was autonomously generated by an AI." JA 49, 63.[4]

Given these unambiguous disclaimers, the Copyright Office and the district court properly declined to consider whether the work here reflects Dr. Thaler's input. For its part, the Copyright Office observed that it had no occasion to consider that question because Dr. Thaler was "not assert[ing] that the Work was created with contribution from a human author" and was "not rais[ing] this as a basis for registration." JA 73 & n.3. The district court, in turn, correctly limited its review to the arguments Dr. Thaler had made to the agency. "By design in plaintiff's framing of the registration application," the court noted, "the single legal question presented here is whether a work generated autonomously by a computer falls under the protection of copyright law upon its creation." JA 190. As the district court put it, Dr. Thaler could not "transform the issue" "by asserting new facts" suggesting that "he played a controlling role in generating the work" because those "statements

---

[4] Consistent with Dr. Thaler's position before the agency, his counsel has filed public comments with the Copyright Office, stating that this litigation is a "test case[] seeking intellectual property rights for AI-generated output in the absence of a traditional human author." *See* Letter from Ryan Abbott, Professor of Law & Health Scis., Univ. of Surrey, to U.S. Copyright Office 1 (Oct. 21, 2023), https://perma.cc/KG7J-2LUF.

directly contradict" his position before the agency. JA 197. This Court should likewise decline to entertain Dr. Thaler's new argument.

Even on their own terms, Dr. Thaler's new assertions of human input are unavailing. Nothing in the opening brief identifies or suggests that Dr. Thaler made specific creative choices that contributed to the work. Dr. Thaler claims only that he made "an indirect contribution" by "training the AI system that made the work." Br. 57. This purported contribution does not satisfy the Supreme Court's century-old requirement that a work be the result of the author's "own original mental conception, to which [Dr. Thaler] gave visible form." *Sarony*, 111 U.S. at 59–60 (quotation marks omitted). On the record that Dr. Thaler presented, there was no way for the Copyright Office to assess—consistent with decades of case law and agency practice—whether "the computer [or other device] merely [was] an assisting instrument" for a human's creative efforts, or whether "the traditional elements of authorship in the work ... were actually conceived and executed not by man but by a machine." *Compendium (Third)* § 313.2 (second alteration added) (quoting *Sixty-Eighth Annual Report of the Register of Copyrights for the Fiscal Year Ending June 30, 1965*, *supra*, at 5).

Dr. Thaler's new arguments thus fall far short of the kinds of creative choices that would be required for copyright protection for an AI-generated

work. The Copyright Office recognizes that, in some cases, "a work containing AI-generated material will also contain sufficient human authorship to support a copyright claim," such as when a human "select[s] or arrange[s] AI-generated material" in a creative way. 88 Fed. Reg. at 16,192; *see id.* at 16,192–93 (explaining that artificial intelligence can be a creative tool like many others at an artist's disposal). But Dr. Thaler's vague and conclusory arguments about his supposed "indirect" contributions, Br. 57, offer no insight into "the extent to which [a] human had creative control over the work's expression," 88 Fed. Reg. at 16,193. For these reasons, Dr. Thaler's policy concerns—*e.g.*, that the Copyright Act should provide a clearer "dividing line" for copyrightability, Br. 58—are irrelevant. Wherever that line is (or, in Dr. Thaler's view, should be), the representations in his application to the agency did not come close to crossing it.

2.    Lacking express text to support his position, Dr. Thaler turns to perceived omissions in the Copyright Act. In particular, Dr. Thaler contends that 17 U.S.C. § 102(b) "says nothing about limiting protection for works created by non-human entities" and that therefore the Copyright Act cannot restrict "the identity of the author." Br. 22–23.

That argument misunderstands § 102(b)'s statutory role. This subsection takes as given that "an original work of authorship" exists and provides

40

that copyright in a work extends to expressions, not "idea[s]." 17 U.S.C. § 102(b); *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 356 (1991) (explaining that § 102(b) repeats copyright law's "basic dichotomy between expression and idea"). It "'in no way enlarges or contracts the scope of copyright protection under the present law.'" *Feist*, 499 U.S. at 356 (noting congressional intent to incorporate the 1909 Copyright Act's scope of protection). Indeed, the authorship requirement appears in a different subsection. 17 U.S.C. § 102(a).

There is likewise no merit to Dr. Thaler's efforts to redefine the statutory authorship requirement by quoting a dictionary published last year. Invoking the 2023 edition of Merriam-Webster, Dr. Thaler observes that an "author" can mean "one that originates or creates something" and that, under a certain definition, the term "one" can include a "person or *thing*." Br. 23 (quotation marks omitted). Thus, the circuitous argument goes, a "thing" like Dr. Thaler's machine can be an "author." It is entirely unclear what bearing a 2023 dictionary would have on the interpretation of the Copyright Act of 1976, much less how the dictionary's definition would account for all the statutory indications that authors must be human for purposes of the Copyright Act.

41

**3.**    Dr. Thaler alternatively argues (Br. 45–52) that he was entitled to registration under the Copyright Act because the alleged author is his tangible property under state-law principles. That conclusion does not follow from its premise.

Dr. Thaler's core contention is that his machine is personal property that "transfer[red]" copyright to him "by operation of law." Br. 45 (quoting 17 U.S.C. § 204(a)). But that view misapprehends the relevant order of operations. A "transfer of copyright ownership" can occur only if a valid copyright exists in the first place. 17 U.S.C. § 204(a). As the district court observed, Dr. Thaler's arguments on this score "put the cart before the horse" because he lacks a copyrightable work to begin with. JA 191. The provisions that Dr. Thaler cites undermine his position because they contemplate that authors who transfer rights have something that machines do not: either legal capacity to bind themselves, *see, e.g.*, 17 U.S.C. § 204(a) (referencing a "writing" "signed by the owner of the rights conveyed"); or the capacity to pass rights to human heirs, *see, e.g.*, *id.* § 201(d)(1) (referencing "intestate succession"); *id.* § 203(a) (conferring rights to terminate a transfer in the "author" or, "[w]here an author is dead," on the author's "widow or widower," "surviving children," and "grandchildren").

42

Dr. Thaler's arguments also elide the differences between physical property and intellectual property. For example, the opening brief surmises that, "if Dr. Thaler owned a fruit tree, he would own the fruit from that tree," Br. 47, and that generally "'the first person to possess an object is its owner,'" Br. 49. But those examples have nothing to do with intellectual property generally, let alone copyright specifically. They also disregard the Copyright Act's express recognition that "[o]wnership of a copyright" is "distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. Rather, a "[t]ransfer of ownership of any material object" embodying a copyrighted work "does not of itself convey any rights" in the copyright. *Id.*; *see also Community for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1495 n.12 (D.C. Cir. 1988) (explaining that, absent a "written instrument" of conveyance, the Copyright Act "definitively rejects the common law presumption that an artist sells the copyright upon sale of the material object" (citation omitted)), *aff'd,* 490 U.S. 730 (1989); *Wheaton v. Peters*, 33 U.S. 591, 661–62 (1834) (acknowledging that the copyright statute, not the common law, is the source of authors' rights). Whether Dr. Thaler possesses a machine is orthogonal to whether he has a copyright.[5]

---

[5] Dr. Thaler's reliance on state-law principles also overlooks the Copyright Act's express preemption provision. "[N]o person is entitled to any

*Continued on next page.*

**4.**     Straying further from statutory text, Dr. Thaler ventures various policy reasons to extend copyright protection to AI-generated works. Those arguments are misplaced.

As an initial matter, Dr. Thaler's references (Br. 31–32) to broad constitutional goals are inapposite. The Copyright Clause is a grant of legislative power to Congress. U.S. Const. art. I, § 8, cl. 8. In passing the Copyright Act, Congress was well within its scope of constitutional authority to limit authorship to human beings. Indeed, the Federal Circuit has rejected identical constitutional arguments in Dr. Thaler's challenge to the Patent Act's analogous human-inventor requirement. *See Thaler v. Vidal*, 43 F.4th 1207, 1209–10, 1213 (Fed. Cir. 2022) (rejecting Dr. Thaler's effort to obtain a patent for an invention by his "Creativity Machine" because "inventors must be natural persons"), *cert. denied*, 143 S. Ct. 1783 (2023). And whether it is good policy to encourage the creation and distribution of AI-generated works is hotly debated. At bottom, Dr. Thaler's "appeal to copyright policy" is "addressed to the wrong forum." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1511 (2020). "It is generally for Congress, not the courts, to decide how best to

---

[copyright] or equivalent right in any … work under the common law or statutes of any State." 17 U.S.C. § 301(a). Insofar as Dr. Thaler suggests that state property law grants him copyright, the state law would likely be preempted. *See id.*; *see also Reid*, 846 F.2d at 1495 n.12.

pursue the Copyright Clause's objectives." *Id.* (alteration omitted) (quoting *Eldred*, 537 U.S. at 212).

More generally, Dr. Thaler's policy views supply no basis to set aside the Copyright Office's action under the Administrative Procedure Act or to reinterpret the Copyright Act. As explained above, the statutory authorship requirement has a "settled meaning," and any objections should be taken to Congress, which within the Copyright Clause's limits "can correct any mistake it sees." *Georgia*, 140 S. Ct. at 1510 (quoting *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 456 (2015)). Until then, Congress has "supplie[d] a constitutionally valid rule of decision," and "federal courts must follow it." *Brown v. Davenport*, 596 U.S. 118, 127 (2022).[6]

Even further afield is Dr. Thaler's insistence that he displayed "transparency and candor" in his application to "allow the Work to be identified as AI-generated." Br. 57–58. The possibility that a hypothetical applicant could "neglect[] to mention" or "misrepresent[] the contribution of AI systems"

---

[6] Like Dr. Thaler, the amicus brief supporting him takes up a policy debate properly resolved by Congress. In any event, amici appear to labor under the misimpression that "copyright will never be granted to the creations of artificial intelligence." Amici Br. 37. The Copyright Office in fact takes a "a case-by-case" approach to determining whether works containing AI-generated material reflect sufficient human authorship. 88 Fed. Reg. at 16,192.

when seeking to register future works, Br. 58, is not a reason to provide copyright registration to works that do not satisfy the statutory prerequisites. In any case, Congress addressed this concern by prescribing fines for a knowingly "false representation of a material fact in the application," 17 U.S.C. § 506(e), and by providing that a registration could be invalidated if the applicant had knowingly submitted materially "inaccurate information," *id.* § 411(b)(1); *see* 88 Fed. Reg. at 16,193 (noting that applicants "have a duty to disclose the inclusion of AI-generated content" and "to provide a brief explanation of the human author's contributions to the work").

As a practical matter, the Copyright Office's registration specialists, who conduct the first line of review for registration applications, commonly engage in correspondence with applicants when reviewing applications. If a registration specialist "discovers that [an] applicant failed to provide sufficient information" or "otherwise failed to meet the registration requirements," the specialist typically "will communicate with the applicant" about those issues. *Compendium (Third)* §§ 605.3(B), 605.6, 605.7 (stating that registration specialists may close file if an applicant does not timely respond to communications from the Copyright Office).

**5.** Finally, even were the Court to agree with Dr. Thaler on the merits, it should not determine that he is entitled to copyright protection, but

instead allow the agency to engage in "renewed consideration consistent with this court's opinion." *Atari Games Corp. v. Oman*, 979 F.2d 242, 247 (D.C. Cir. 1992); *see* JA 126–127 n.1 (government's brief noting the same point). The Copyright Office would then consider in the first instance whether the work at issue satisfies any other conditions for copyright—including the originality requirement. *See, e.g.*, 17 U.S.C. § 102(a) (requiring that a work be "original"); *Feist*, 499 U.S. at 345 (explaining that originality requires "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity").

Dr. Thaler is mistaken to declare it "undisputed" that the work here would have been "protected by copyright" had a natural person created it "without computer assistance," Br. 21, or that the summary-judgment "posture" somehow establishes that the work is sufficiently "original," Br. 21 n.2. The Copyright Office disputed these points when Dr. Thaler attempted to raise them in the district court. JA 126–127. Regardless, the district court did not pass on those questions, and they are not before this Court.

47

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

SUZANNE V. WILSON
  *General Counsel and Associate*
    *Register of Copyrights*

EMILY L. CHAPUIS
  *Deputy General Counsel*

ANDREW FOGLIA
  *Deputy Director of Policy and*
    *International Affairs*

MARK T. GRAY
JOHN R. RILEY
  *Assistant General Counsel*

  *U.S. Copyright Office*

March 2024

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

DANIEL TENNY

 */s/ Nicholas S. Crown*
NICHOLAS S. CROWN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *nicholas.s.crown@usdoj.gov*

48

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,326 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

 */s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF SERVICE

I certify that on March 6, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

_/s/ Nicholas S. Crown_
Nicholas S. Crown

**ADDENDUM**

# TABLE OF CONTENTS

U.S. Const. art. I, § 8, cl. 8 .................................................................. A1

17 U.S.C. § 101 ....................................................................................... A1

17 U.S.C. § 102 ....................................................................................... A2

17 U.S.C. § 106 ....................................................................................... A3

17 U.S.C. § 106A .................................................................................... A3

17 U.S.C. § 201 ....................................................................................... A5

17 U.S.C. § 202 ....................................................................................... A6

17 U.S.C. § 203 ....................................................................................... A6

17 U.S.C. § 204 ....................................................................................... A7

17 U.S.C. § 301 ....................................................................................... A7

17 U.S.C. § 302 ....................................................................................... A8

17 U.S.C. § 304 ....................................................................................... A9

17 U.S.C. § 408 ..................................................................................... A12

17 U.S.C. § 409 ..................................................................................... A12

17 U.S.C. § 410 ..................................................................................... A13

17 U.S.C. § 411 ..................................................................................... A14

17 U.S.C. § 412 ..................................................................................... A14

17 U.S.C. § 506 ..................................................................................... A15

17 U.S.C. § 701 ..................................................................................... A15

17 U.S.C. § 702 ..................................................................................... A16

37 C.F.R. § 202.3 .................................................................................. A17

37 C.F.R. § 202.5 .................................................................................. A18

## Constitution of the United States

### Article I, § 8, cl. 8

The Congress shall have Power … To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

## 17 U.S.C. § 101

### § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

…

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

…

A "work of visual art" is—

(1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

(2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include—

…

(B) any work made for hire; …

…

A "work made for hire" is—

A1

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

## 17 U.S.C. § 102

### § 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

## 17 U.S.C. § 106

### § 106. Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

## 17 U.S.C. § 106A

### § 106A. Rights of certain authors to attribution and integrity

(a) Rights of Attribution and Integrity.—Subject to section 107 and independent of the exclusive rights provided in section 106, the author of a work of visual art—

(1) shall have the right—

(A) to claim authorship of that work, and

(B) to prevent the use of his or her name as the author of any work of visual art which he or she did not create;

A3

(2) shall have the right to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and

(3) subject to the limitations set forth in section 113(d), shall have the right—

> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

(b) Scope and Exercise of Rights.—

> Only the author of a work of visual art has the rights conferred by subsection (a) in that work, whether or not the author is the copyright owner. The authors of a joint work of visual art are coowners of the rights conferred by subsection (a) in that work.

...

(d) Duration of Rights.—

> (1) With respect to works of visual art created on or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, the rights conferred by subsection (a) shall endure for a term consisting of the life of the author.

(e) Transfer and Waiver.—

> (1) The rights conferred by subsection (a) may not be transferred, but those rights may be waived if the author expressly agrees to such waiver in a written instrument signed by the author. Such instrument shall specifically identify the work, and uses of that work, to which the waiver applies, and the waiver shall apply only to the work and uses so identified. In the case of a joint work prepared by two or more authors, a waiver of rights under this paragraph made by one such author waives such rights for all such authors.

> (2) Ownership of the rights conferred by subsection (a) with respect to a work of visual art is distinct from ownership of any copy of that work, or

A4

of a copyright or any exclusive right under a copyright in that work. Transfer of ownership of any copy of a work of visual art, or of a copyright or any exclusive right under a copyright, shall not constitute a waiver of the rights conferred by subsection (a). Except as may otherwise be agreed by the author in a written instrument signed by the author, a waiver of the rights conferred by subsection (a) with respect to a work of visual art shall not constitute a transfer of ownership of any copy of that work, or of ownership of a copyright or of any exclusive right under a copyright in that work.

## 17 U.S.C. § 201

## § 201. Ownership of Copyright

(a) Initial Ownership.—

Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

(b) Works Made for Hire.—

In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

...

(d) Transfer of Ownership.—

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

## 17 U.S.C. § 202

## § 202. Ownership of Copyright as distinct from ownership of material object

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

## 17 U.S.C. § 203

## § 203. Termination of Transfers and licenses granted by the author

(a) Conditions for Termination.—In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

A6

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

...

## 17 U.S.C. § 204

### § 204. Execution of transfers of copyright ownership

(a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

...

## 17 U.S.C. § 301

### § 301. Preemption with respect to other laws

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

...

**17 U.S.C. § 302**

## § 302. Duration of copyright: Works created on or after January 1, 1978

(a) In General.—

Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.

(b) Joint Works.—

In the case of a joint work prepared by two or more authors who did not work for hire, the copyright endures for a term consisting of the life of the last surviving author and 70 years after such last surviving author's death.

(c) Anonymous Works, Pseudonymous Works, and Works Made for Hire.—

In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

(d) Records Relating to Death of Authors.—

Any person having an interest in a copyright may at any time record in the Copyright Office a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date. The statement shall identify the person filing it, the nature of that person's interest, and the source of the information recorded, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall maintain current records of

information relating to the death of authors of copyrighted works, based on such recorded statements and, to the extent the Register considers practicable, on data contained in any of the records of the Copyright Office or in other reference sources.

(e) Presumption as to Author's Death.—

After a period of 95 years from the year of first publication of a work, or a period of 120 years from the year of its creation, whichever expires first, any person who obtains from the Copyright Office a certified report that the records provided by subsection (d) disclose nothing to indicate that the author of the work is living, or died less than 70 years before, is entitled to the benefits of a presumption that the author has been dead for at least 70 years. Reliance in good faith upon this presumption shall be a complete defense to any action for infringement under this title.

## 17 U.S.C. § 304

## § 304. Duration of copyright: Subsisting copyrights

(a) Copyrights in Their First Term on January 1, 1978.—

(1)

(A) Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

(B) In the case of—

(i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

(ii) any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire,

the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

(C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

(i) the author of such work, if the author is still living,

(ii) the widow, widower, or children of the author, if the author is not living,

(iii) the author's executors, if such author, widow, widower, or children are not living, or

(iv) the author's next of kin, in the absence of a will of the author,

shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

...

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.—In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

A10

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

...

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection....

...

A11

## 17 U.S.C. § 408

### § 408. Copyright registration in general

(a) Registration Permissive.—

At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708. Such registration is not a condition of copyright protection.

...

## 17 U.S.C. § 409

### § 409. Application for copyright registration

The application for copyright registration shall be made on a form prescribed by the Register of Copyrights and shall include—

(1) the name and address of the copyright claimant;

(2) in the case of a work other than an anonymous or pseudonymous work, the name and nationality or domicile of the author or authors, and, if one or more of the authors is dead, the dates of their deaths;

(3) if the work is anonymous or pseudonymous, the nationality or domicile of the author or authors;

(4) in the case of a work made for hire, a statement to this effect;

(5) if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright;

(6) the title of the work, together with any previous or alternative titles under which the work can be identified;

(7) the year in which creation of the work was completed;

(8) if the work has been published, the date and nation of its first publication;

(9) in the case of a compilation or derivative work, an identification of any preexisting work or works that it is based on or incorporates, and a

brief, general statement of the additional material covered by the copyright claim being registered; and

(10) any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright.

If an application is submitted for the renewed and extended term provided for in section 304(a)(3)(A) and an original term registration has not been made, the Register may request information with respect to the existence, ownership, or duration of the copyright for the original term.


## 17 U.S.C. § 410

### § 410. Registration of claim and issuance of certificate

(a) When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

(b) In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

(c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

...

## 17 U.S.C. § 411

### § 411. Registration and civil infringement actions

(a) Except for an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection (b), no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

(b)

(1) A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—

(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

(B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

...

## 17 U.S.C. § 412

### § 412. Registration as prerequisite to certain remedies for infringement

In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a), an action for infringement of the copyright of a work that has been preregistered under section 408(f) before the commencement of the infringement and that has an effective date of registration not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the

infringement, or an action instituted under section 411(c), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

## 17 U.S.C. § 506

### § 506. Criminal offenses

...

(e) False Representation.—

Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

...

## 17 U.S.C. § 701

### § 701. The Copyright Office: General responsibilities and organization

(a) All administrative functions and duties under this title, except as otherwise specified, are the responsibility of the Register of Copyrights as director of the Copyright Office of the Library of Congress. The Register of Copyrights, together with the subordinate officers and employees of the Copyright Office, shall be appointed by the Librarian of Congress, and shall act under the Librarian's general direction and supervision.

(b) In addition to the functions and duties set out elsewhere in this chapter, the Register of Copyrights shall perform the following functions:

(1) Advise Congress on national and international issues relating to copyright, other matters arising under this title, and related matters.

A15

(2) Provide information and assistance to Federal departments and agencies and the Judiciary on national and international issues relating to copyright, other matters arising under this title, and related matters.

(3) Participate in meetings of international intergovernmental organizations and meetings with foreign government officials relating to copyright, other matters arising under this title, and related matters, including as a member of United States delegations as authorized by the appropriate Executive branch authority.

(4) Conduct studies and programs regarding copyright, other matters arising under this title, and related matters, the administration of the Copyright Office, or any function vested in the Copyright Office by law, including educational programs conducted cooperatively with foreign intellectual property offices and international intergovernmental organizations.

(5) Perform such other functions as Congress may direct, or as may be appropriate in furtherance of the functions and duties specifically set forth in this title.

...

## 17 U.S.C. § 702

## § 702. Copyright Office regulations

The Register of Copyrights is authorized to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title. All regulations established by the Register under this title are subject to the approval of the Librarian of Congress.

A16

**37 C.F.R. 202.3**

**§ 202.3. Registration of copyright.**

(a) General.

(1) This section prescribes conditions for the registration of copyright, and the application to be made for registration under sections 408 and 409 of title 17 of the United States Code.

(2) For the purposes of this section, the terms audiovisual work, compilation, copy, derivative work, device, fixation, literary work, motion picture, phonorecord, pictorial, graphic and sculptural works, process, sound recording, and their variant forms, have the meanings set forth in section 101 of title 17. The term author includes an employer or other person for whom a work is "made for hire" under section 101 of title 17.

(3) For the purposes of this section, a copyright claimant is either:

(i) The author of a work;

(ii) A person or organization that has obtained ownership of all rights under the copyright initially belonging to the author.[1]

[1] This category includes a person or organization that has obtained, from the author or from an entity that has obtained ownership of all rights under the copyright initially belonging to the author, the contractual right to claim legal title to the copyright in an application for copyright registration.

...

(c) Application for registration.

(1) As a general rule, an application for copyright registration may be submitted by any author or other copyright claimant of a work, the owner of any exclusive right in a work, or the duly authorized agent of any such author, other claimant, or owner. A Single Application, however, may be submitted only by the author/claimant or by a duly authorized agent of the author/claimant, provided that the agent is identified in the application as the correspondent.

(2) All applications shall include the information required by the particular form, and shall be accompanied by the appropriate filing fee, as required in § 201.3(c) of this chapter, and the deposit required under 17 U.S.C. 408 and § 202.20, § 202.21, or § 202.4, as appropriate. ...

A17

**37 C.F.R. 202.5**

## § 202.5. Reconsideration Procedure for Refusals to Register.

(a) General. This section prescribes rules pertaining to procedures for administrative review of the Copyright Office's refusal to register a claim to copyright, a mask work, or a vessel design upon a finding by the Office that the application for registration does not satisfy the legal requirements of title 17 of the United States Code. If an applicant's initial claim is refused, the applicant is entitled to request that the initial refusal to register be reconsidered.

(b) First reconsideration. Upon receiving a written notification from the Registration Program explaining the reasons for a refusal to register, an applicant may request that the Registration Program reconsider its initial decision to refuse registration, subject to the following requirements:

(1) An applicant must request in writing that the Registration Program reconsider its decision. A request for reconsideration must include the reasons the applicant believes registration was improperly refused, including any legal arguments in support of those reasons and any supplementary information. The Registration Program will base its decision on the applicant's written submissions.

...

(c) Second reconsideration. Upon receiving written notification of the Registration Program's decision to refuse registration in response to the first request for reconsideration, an applicant may request that the Review Board reconsider the Registration Program's refusal to register, subject to the following requirements:

(1) An applicant must request in writing that the Review Board reconsider the Registration Program's decision to refuse registration. The second request for reconsideration must include the reasons the applicant believes registration was improperly refused, including any legal arguments in support of those reasons and any supplementary information, and must address the reasons stated by the Registration Program for refusing registration upon first reconsideration. The Board will base its decision on the applicant's written submissions.

...

(g) Final agency action. A decision by the Review Board in response to a second request for reconsideration constitutes final agency action.

A18