DISTRICT OF COLUMBIA
COURT OF APPEALS

STEPHEN THALER,

*Plaintiff and Appellant,*

v.

SHIRA PERLMUTTER, Register of Copyrights and

Director of the United States Copyright Office, et al.,

*Defendant and Appellee.*

**APPELLANT'S REPLY BRIEF**

On Appeal From Order of the United States District Court
for the District of Columbia

(Oral argument not yet scheduled)

Honorable Beryl A. Howell
Case No. 1:22-cv-01564-BAH

**BROWN NERI SMITH & KHAN LLP**
Ryan Abbott (SBN 281641)
*ryan@bnsklaw.com*
Timothy G. Lamoureux (SBN 294048)
*tim@bnsklaw.com*
11601 Wilshire Blvd., Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Appellant Stephan Thaler*

# TABLE OF CONTENTS

**Page(s)**

I. SUMMARY OF ARGUMENT ...............................................5

II. ARGUMENT .............................................................................8

    A. The USCO's Statutory Interpretation Ignores the Plain Language of the Copyright Statute and Relevant Case Law Which Expressly Protects Original Works of Non-Human Authors ................................................................8

    B. Dr. Thaler Owns the Copyright to the Work...................12

        1. If the Creativity Machine Authored the Work, Dr. Thaler Is the Owner Through Standard Principles of Property Law ...........................................................12

        2. Alternatively, Dr. Thaler is the Work's Author ........15

III. CONCLUSION ....................................................................24

CERTIFICATE OF COMPLIANCE.....................................................26

CERTIFICATE OF SERVICE.............................................................27

ADDENDUM ...................................................................................1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burrow-Giles Lithographic Co. v. Sarony,*
  111 U.S. 53 (1884) ..........................................................20, 21, 22, 23

*Cmty. for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989) ....................................................................11, 18

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,*
  499 U.S. 340 (1991) ...........................................................................20

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .............................................................................9

*Georgia v. Public.Resource.Org, Inc.,*
  590 U.S. 255 (2020) ...........................................................................10

*Google LLC v. Oracle Am., Inc.,*
  593 U.S. 1 (2021) ...............................................................................19

*Horror Inc. v. Miller,*
  15 F.4th 232 (2d Cir. 2021) .................................................11, 17, 19

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013) .............................................................10

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ...........................................................................19

*Warren v. Fox Family Worldwide, Inc.,*
  328 F.3d 1136 (9th Cir. 2003) .........................................................10

**Statutes**

17 U.S.C. § 101 ..............................................................................11, 16

17 U.S.C. § 201 ...................................................................................15

17 U.S.C. § 204(a) ..............................................................................15

17 U.S.C. § 302(a) ................................................................................9

17 U.S.C. § 302(c) ...................................................................8

17 U.S.C. § 304 ...................................................................10

**Other Authorities**

Arthur R. Miller, *Copyright Prot. for Computer Programs, Databases, & Computer-Generated Works: Is Anything New Since Contu?,* 106 Harv. L. Rev. 977 (1993) ..................................................19

John Tehranian, *Copyright's Male Gaze: Authorship & Inequality in A Panoptic World*, 41 Harv. J.L. & Gender 343 (2018) ...................21

Thomas W. Merrill, *Accession & Original Ownership*,Accession & Original Ownership, 1 J. Legal Analysis 459 (2009)......................13

## I. SUMMARY OF ARGUMENT

There are fundamental truths in this case that the USCO has not persuasively addressed—namely, the Work exists, the Work is original, and it would be flatly inconsistent with the purpose of the Copyright Act (the "Act") to deny the Work protection under the statute. Indeed, protection must be afforded to incentivize the creation and dissemination of such original pieces, and Dr. Thaler has put forth several viable theories for doing so.

The USCO spends the bulk of its brief straining the language of the Act to argue that, because the Work's "author," in the traditional sense, was not human, it cannot be copyrighted. But this argument is self-evidently wrong, as the Act itself (and decades of case law interpreting it) provides for copyright protection of works whose authors are not human. The USCO essentially glosses over this point without meaningfully addressing it or explaining why a work made by a legal fiction can be protected but not one made by an AI system. Registrations for corporate or government authored works have no requirement to identify any human contribution or human author. Works created by an AI fit just as well within the framework of the Act, so the only sensible outcome is that the copyright to those works flows to the AI's owner and user.

Stepping back, the USCO never contests the logical point that, if it is correct that a machine cannot be a legal author, then that leaves only Dr. Thaler—the machine's creator, owner, programmer, and user—as the author, either under the work-made-for-hire doctrine or directly as the Work's author. Under either scenario, Dr. Thaler again holds the copyright.

The USCO attempts to evade this logical outcome by distorting the factual record to claim that Dr. Thaler has waived any right to claim that he is the work's author. Specifically, the USCO wrongly claims that Dr. Thaler disclaimed that the AI is his "employee" for purposes of the work-made-for-hire doctrine, and further wrongly contends that Dr. Thaler has conceded the work was autonomously created and thus he cannot be the direct author.

These are both mischaracterizations of the underlying record. With respect to the work-made-for-hire doctrine, that was the initial basis of Dr. Thaler's registration submission to the USCO, and Dr. Thaler expressly alleged in his Complaint in the District Court that the AI "functionally behaves as an employee or independent contractor in creating AI-Generated Works" for purposes of the Act.

Similarly, Dr. Thaler has consistently argued on the record that, while he does not consider himself the author of the Work in the

traditional sense of a human being putting pen to paper, he is the undisputed human originator of the Work. He is the creator, owner, programmer, and user of the machine that outputted the Work.

Critically, at no point does the Act contain a requirement that a person be a "traditional" author for a work to receive protection, despite the significant amount of space the USCO devoted to attacking Dr. Thaler' status as a traditional author. To insert this unsupported limitation into the Act would violate basic canons of statutory construction.

The USCO's interpretation is not only inconsistent with the language of the Act, but it also frustrates the fundamental constitutional purpose of intellectual property systems to further the progress of science and the useful arts. As the Amicus brief in this case carefully examines, the use of generative AI systems to make creative works is now a widespread phenomenon providing significant public benefits. Encouraging this behavior is something that falls squarely within the four corners of the Act. Copyright law has always needed to adapt to new technologies and new methods of creating original works—from cameras, to computers, and now to AI—and affording copyright protection to AI-generated original works follows the language and purpose of the Act.

## II.    ARGUMENT

### A.    The USCO's Statutory Interpretation Ignores The Plain Language Of The Copyright Statute And Relevant Case Law Which Expressly Protects Original Works Of Non-Human Authors

The USCO devotes a substantial portion of its brief to an argument that is foreclosed by the plain language of the Act itself— namely, the USCO's contention that a work is only entitled to copyright protection if its "author" is a human being.

The USCO selectively cites to language regarding the impact of an author's death under the Act and suggests that this language necessarily requires that an author be human.  The USCO all but ignores, however, that the Act accommodates non-human authors. For over a hundred years the Act, and its prior iteration, have allowed for corporations, governments, and similar non-human entities to be considered authors under the statute. *See Act of March 4, 1909, ch. 320*, 35 Stat. 1075.  Similarly, the Act has provisions specifically for works created by authors with no known or natural lifespan. 17 U.S.C. § 302(c) ("In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term

of 120 years from the year of its creation, whichever expires first.")
Thus, the fact that *some* provisions of the Act relate specifically to
human authors does not mean that *only* works authored by humans
are protected.

As discussed at more length in Dr. Thaler's Opening Brief, the
statutory scheme enforces a clear practical design to incorporate and
facilitate copyright for non-human authored works. For example,
durations of copyright for works for hire is divorced from a human
lifespan, which is a distinct choice distinguishing it from protection
"in general." 17 U.S.C. § 302(a), (c). Termination is a right for an
author, and their families, which non-human authors cannot have, so
the termination provisions explicitly do not apply to works for hire.
§§ 203, 304. Despite discussing duration and termination, the
USCO's silence as to these provisions that clearly contemplate and
make concessions based on the non-human nature of at least some
authors speaks volumes, and one cannot interpret a statute by taking
provisions out of context in a vacuum. *Food & Drug Admin. v. Brown
& Williamson Tobacco Corp.*, 529 U.S. 120, 120 (2000) ("It is a
fundamental canon of statutory construction that the words of a
statute must be read in their context and with a view to their place in
the overall statutory scheme.") Thus, the Copyright Office's

interpretation of the Act to bar nonhuman authorship cannot be correct.

Indeed, the notion that a work is entitled to copyright protection even if its "author" is not human has been repeatedly recognized by the USCO and Courts and is simply not controversial. *See*, *e.g. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140–41 (9th Cir. 2003). The USCO does not and cannot cite to any language in the Act providing otherwise. Instead, it essentially cites to itself, relying on its own Compendium of U.S. Copyright Office Practices, which states that the USCO "will refuse to register a claim if it determines that a human being did not create the work." USCO Br. at 34, *quoting Compendium (Third)* § 306. But as the Supreme Court has recognized, "the Compendium is a non-binding administrative manual" whose "guidance" is "unpersuasive" when existing precedent already addresses the issue. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 271 (2020). Here, the plain language of the Act and decades of jurisprudence already provide that an "author" need not be a human for a work to be protectable under the Act. Any contrary language in the Compendium is "unpersuasive" and should not be considered. *Id.*

The USCO also argues that "[e]ven when Congress deviated" from the requirement that a human be listed as a work's author—for example, in the work-made-for-hire context, where an employing entity can be regarded as the author— "it enacted provisions requiring that the person who created the work have capacity to enter employment arrangements and binding agreements." USCO Br. at 2. USCO's argument, however, is a distortion of statutory language and existing case law.

The work-made-for-hire provision of the Act provides that an employer (including a non-human entity) is the "author" of a work created by an "employee," but notably the statute does not define the term "employee"—let alone limit it to one who "ha[s] capacity to enter employment arrangements," as the USCO attempts to characterize it. *See* 17 U.S.C. § 101. In fact, Courts interpreting the work-made-for-hire provision have expressly rejected efforts to import a definition of "employee" from other statutory frameworks, including the labor code. *See Horror Inc. v. Miller*, 15 F.4th 232, 244–47 (2d Cir. 2021). Instead, Courts apply the test set out in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) ("*CCNV*") to determine whether an author of a work was acting as an "employee"

for purposes of the Act—which test, as detailed below,[1] does not require that an author be a human to be considered an employee under the statute.

Thus, nothing in the Act provides that an original work is only protected if its creator is a human, and there is no bar to the AI system in this case being considered the author of the Work, therefore no such restriction should be judicially inserted into the Act.  As discussed in Dr. Thaler's Opening Brief, that is the straightforward outcome most consistent with transparency, candor, promoting accurate property entitlement, and to protecting the moral rights of human authors.

## B.  Dr. Thaler Owns The Copyright To The Work

### 1.  If The Creativity Machine Authored The Work, Dr. Thaler Is The Owner Through Standard Principles Of Property Law

Once it is accepted that original works authored by the Creativity Machine are copyrightable, the next question is: Who owns that copyright? Given that the machine itself cannot possess

_____

[1] This issue is fully discussed in Section II.B.1 of this Reply; Dr. Thaler's Creativity Machine qualifies as an employee under Section 101 of the Copyright Act.

intellectual property rights, the only logical result is that Dr. Thaler—the machine's creator and user—holds the copyright.

In his Opening Brief, Dr. Thaler cited longstanding rules of property law for the uncontroversial notion that a property owner also holds the rights to derivative property created by his property—the so-called "fruit of the tree" doctrine. *See* Thomas W. Merrill, *Accession & Original Ownership*, 1 J. Legal Analysis 459, 463 (2009). In response, the USCO claims Dr. Thaler is purportedly conflating traditional property law with intellectual property law and argues that Dr. Thaler's possession of the Creativity Machine "is orthogonal to whether he has a copyright." USCO Br. At 43. The USCO is incorrect. As the owner, programmer, and user of the machine, Dr. Thaler is the *only* logical holder of the copyright on original works created by the machine, and it is by virtue of his ownership and use of the machine that the copyright flows to him. His ownership of the machine is thus not "orthogonal" to the question of whether he has a copyright—it bears directly on why he should be recognized as the owner of the copyright. Notably, the USCO does not put forth any alternative for who could reasonably be considered the owner of the copyright on works created by the machine. USCO instead rests on the claim that the Work is fundamentally unprotectable, which

requires a view of intellectual property as wholly distinct from other sorts of property and general property law principles. To the contrary, copyright, like any other property right, can be freely given away, abandoned, contracted for, sold, licensed, co-owned, etc., and the USCO fails to provide justification as to why other standard property principles do not likewise apply here.

The USCO, in fact, explicitly avoids the question, by saying that Dr. Thaler "misapprehends the relevant order of operations." USCO Br. at 42. The USCO's argument is essentially that because a machine cannot be an author, the property never exists in the first instance, so there cannot be a transfer "by operation of law" pursuant to Section 204(a) of the Act. *Id*. But if the Court agrees with Dr. Thaler and finds the property exists, it must be attainable and ownable by someone. The USCO never addresses this question, such that it waives the issue. The logical result, and the logical interpretation of the Act, is that if the AI system is the author then the standard operation of law that transfers ownership under the Copyright Act makes Dr. Thaler the owner.[2]

_____

[2] Instead of addressing the issue, the USCO suggests in a footnote that the common law authorities cited by Dr. Thaler for the "fruit of the tree" doctrine "would likely be" preempted by the Copyright Act. USCO Br. at 44. First, positing an idea as a possibility without more

2. <u>Alternatively, Dr. Thaler Is The Work's Author</u>

The USCO's contention that a work must have a human author to be protected makes no difference to the outcome here, even if a machine cannot be a legal author. Such an outcome leaves only Dr. Thaler—a human—as the author of the work.  In fact, Dr. Thaler can reasonably be considered the author of the Work under either the work-made-for-hire provisions, or directly as the author himself given his creation and use of his AI system.  Under either theory, the Work is protectable, and Dr. Thaler holds the copyright.

a. *The Work Was Made For Hire By Dr. Thaler.*

The work-made-for-hire doctrine provides that, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author" for purposes of the Copyright Statute.  17 U.S.C. § 201.  As detailed in Dr. Thaler's

---

does not constitute an argument, so there is nothing for Dr. Thaler to address. Second, even assuming the USCO actually provided argument, there is no preemption because the Copyright Act explicitly allows for copyright transfers "by operation of law." 17 U.S.C. § 204(a). Notably, the USCO never actually addresses the argument that "operation of law" includes a transfer by "fruit of the tree" or similar fundamental principles of property transfer and ownership. This cedes the point. Furthermore, applying well settled principles of law to interpret the statute is standard practice and would not be preempted since it just follows the statutory scheme.

Opening Brief, and as denoted in Dr. Thaler's registration form submitted to the USCO, Dr. Thaler's AI was operating as his employee for the purposes of this doctrine.

First, the USCO does not dispute that Dr. Thaler created, trained, and utilized the AI to create the Work. Instead, the USCO reiterates its argument—without authority—that the work-made-for-hire doctrine "presume[s] that a human created the work." USCO Br. at 36. Again, however, the text of the Act does not support the USCO's contention, as "employee" is nowhere defined as exclusively human. 17 U.S.C. § 101. Nor do the USCO's own registration procedures for work-made-for-hire submissions, which do not even require disclosure of the identity of the originator of the work, let alone that the originator be a human. https://www.copyright.gov/forms/formva.pdf, last accessed February 25, 2023. The USCO's presumption that the work-made-for-hire doctrine contemplates only works made by humans is simply a naked proclamation.

Second, the USCO twists Dr. Thaler's Complaint to argue that he has somehow waived any contention that the AI was acting as his employee for purposes of the Act. Specifically, the USCO argues that Dr. Thaler's allegation in Paragraph 56 of the Complaint that "an AI

is neither a legal employee nor an independent contractor capable of executing a contract" forecloses Dr. Thaler from now arguing the Work is protected under the work-made-for-hire doctrine. USCO Br. at 36-37. But the USCO misleadingly omits the rest of Dr. Thaler's allegation, which, in full, states: "While an AI is neither a legal employee nor an independent contractor capable of executing a contract, *it functionally behaves as an employee or independent contractor in creating AI-Generated Works*." APPX 37, ¶ 56 (emphasis added). In other words, Dr. Thaler specifically alleged that the Work was made by what is functionally his employee and he should therefore receive the copyright. That is the precise argument Dr. Thaler made to the USCO, District Court, and in this appeal, and the USCO's claims to the contrary are misleading at best.[3]

Thus, given that the Act itself does not define "employee" for purposes of this doctrine (and does not foreclose an AI being considered an employee under the statute), and given that Dr. Thaler

---

[3] Dr. Thaler's allegation that AI cannot be a "legal employee" uncontroversially refers broadly to the labor laws and other rules generally related to employment. But as noted above, the meaning of "employee" under the Copyright Act is distinct from the meaning of "employee" under other statutes and concluding that AI is an employee for purposes of copyright protection does not require it to be considered a "legal employee" under labor laws. *See Horror Inc.*, 15 F.4th at 244–47.

specifically sought registration of the Work under the work-made-for-hire doctrine (and thus did not disclaim the argument that the AI can be considered an employee under the Act), it is necessary to turn to the test set out in *CCNV* for determining whether the AI created the Work as an employee of Dr. Thaler. *Community for Creative Non-Violence*, 490 U.S. at 751. Under *CCNV*, a work is made for hire if the applicant had the "right to control the manner and means by which the product is accomplished." *Id.* The Court set out various "non-exhaustive" factors to consider, such as "the source of the instrumentalities and tools;" "the location of the work;" "the duration of the relationship between the parties;" and "whether the hiring party has the right to assign additional projects to the hired party." *Id.*

Dr. Thaler's Opening Brief explained how these factors, on balance, tip in favor of the Creativity Machine qualifying as an employee in the work-made-for-hire context. Notably, the USCO never contested in the administrative record that Dr. Thaler, as the Creativity Machine's creator, user, and programmer, has the right to control it. APPX 047.

But the USCO did not reject the Work's registration on the basis that Dr. Thaler's relationship with his AI did not fit into the

*CCNV* factor test.  Instead, the USCO starts with the unfounded assumption that a copyrightable work must have a very particular sort of human creator, so it rejects the conclusion that AI can fit into the work-for-hire doctrine, but embracing AI-created works within this framework is fully in line with the purpose and nature of the Act.  Indeed, the Supreme Court has emphasized the flexible nature of the Act and how its "general principles" must account for "'significant changes in technology.'"  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984); *see also* Arthur R. Miller, *Copyright Prot. for Computer Programs, Databases, & Computer-Generated Works: Is Anything New Since Contu?*, 106 Harv. L. Rev. 977, 1073 (1993) (copyright law is "embracive and malleable enough to assimilate" computer-generated works into its framework).  And, to reiterate, construing AI to be an employee solely for purposes of the work-made-for-hire doctrine does not mean it must be considered an employee in any other context.  *See Horror Inc.*, 15 F.4th at 244–47.

> b.    *If AI Cannot Be Considered The Author Or An Employee Under The Act, Then Dr. Thaler Must Be The Work's Author As The AI Must*

> *Then Be A Mere Tool Used By Dr. Thaler To*
>
> *Aid His Own Acts Of Creation.*

The USCO does not dispute that the Work exists, nor does it meaningfully contest that the Work contains the minimal amount of originality required to be protected under the Act. *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). Thus, to further the aim of the Copyright Act—i.e., incentivizing the creation and dissemination of original, creative works—an entity must be credited as the author of this original Work. *Id.* at 349. If the USCO is correct that the Creativity Machine is neither an author nor an employee under the Act, then that leaves only Dr. Thaler himself to be the Work's author. *See* Gary Meyers, *The Future Is Now: Copyright Protection for Works Created by Artificial Intelligence*, Texas Law Review Online, Vol 102 (2023) ("[I]t is the humans who develop and employ creative AI technologies who might respond to incentives that would then 'promote the Progress of Science.'") And in that event, Dr. Thaler again holds the copyright to the Work.

Concluding that Dr. Thaler is the direct author of the Work is consistent with precedent. In *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884)—a case relied on extensively by the

USCO in its brief—the Supreme Court addressed whether a photograph taken with a camera is the "production of an author" for purposes of copyright law. In finding that it was, the Court interpreted the term "author" as being the one "'to whom anything owes its origin; originator; maker; one who completes a work of science or literature.'" *Id.* at 57–58.

Here, while Dr. Thaler may not be the Work's author in the same way that someone can author a work without any technological assistance, he is certainly the Work's "originator" in that he designed, built, programmed, and used the AI machine that outputted the Work. *See* John Tehranian, *Copyright's Male Gaze: Authorship & Inequality in A Panoptic World*, 41 Harv. J.L. & Gender 343, 385 (2018) ("Sharing the same etymological root, the terms 'authority' and 'author' derive from the Latin word 'auctor,' which refers to an originator or promoter. As such, the search for authorship is a quest to determine the originator of a work or, quite literally, the person who possesses authority over it.") In other words, but for Dr. Thaler's programming and use of the Creativity Machine, the Work would not have been made. Certainly, Dr. Thaler is the only human who could be found to have originated the Work, and he possesses authority over it by virtue of it being made using his AI.

The USCO contends that Dr. Thaler has disclaimed the argument that he is directly the author of the Work because he previously submitted that the Work "was autonomously generated by an AI." USCO Br. at 37-38. Once again, the USCO misconstrues the record. Dr. Thaler has not claimed that he was uninvolved in the origination of the Work or that he should not be considered its author—to the contrary, Dr. Thaler explained to the USCO that he "is the owner of the AI that generated the [the Work] and should thus be the owner of any copyright;" that he was "the AI's user and programmer;" and that "[t]here is no other individual involved with the AI in the present case who would be an appropriate recipient of any copyright to the submitted [Work]." APPX 063.

Thus, Dr. Thaler has consistently claimed the right to the copyright on the Work by virtue of his ownership, programming, and use of the Creativity Machine. And if the Creativity Machine is not itself considered the author of the Work, and if it cannot be deemed an employee under the work-made-for-hire doctrine, then the only reasonable alternative is that the Creativity Machine must be regarded as the tool through which Dr. Thaler himself authored the Work. Like the photographer in *Sarony*, Dr. Thaler provided human input—i.e., programming the AI to create art works—and the

ultimate Work at issue here can fairly be considered Dr. Thaler's "intellectual invention." *Burrow-Giles Lithographic Co.*, 111 U.S. at 58.

The USCO disagrees. In essence, the USCO contends that AI-generated works uniquely fall in some unprotected penumbra outside the law—the Creative Machine is too advanced to be considered merely a tool by which the Work was authored by Dr. Thaler, yet the machine is not advanced enough to be considered the author itself. Twisting the Act and case law in this manner to allow original, AI-generated works to slip through the cracks of copyright law is the opposite of promoting progress, however. Under the USCO's proposed framework, there would be no incentive for artists (or anyone) to use new AI technology to create original art, which would obviously be a significant detriment to the creative world and American public.

Imagine the detrimental impact it would have had on the creation and dissemination of original works if the *Sarony* Court had concluded that Congress could only protect "Writings" in a hyper-literal sense. Imagine the breadth of today's creative activities that would have been economically unviable because they could not receive copyright protection—activities the Founders could not have

considered.  Thankfully, the Supreme Court has been clear that such an outcome is the antithesis of how the Act is supposed to be interpreted.

This Court is now presented with an analogous situation to that faced by the *Sarony* Court, and it would be fundamentally inconsistent with the purpose of copyright law for the Court to conclude that the Work cannot be copyrighted. Ultimately, this original Work exists and must be attributed.  If this involves an evolving meaning of authorship in light of technological evolution, it is entirely in line with how the Act is required to be interpreted.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, as well as those discussed in Dr. Thaler's Opening Brief, Dr. Thaler respectfully asks this Court to reverse the district court's order and judgment below, grant summary judgment to Stephen Thaler, and deny the Copyright Office's motion for summary judgment.

Dated: April 10, 2024

Respectfully Submitted,

By: _____/s/ Ryan Abbott_____
            Ryan Abbott, Esq.

Brown, Neri, Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080

Los Angeles, CA 90025

*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This response complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4286 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Word for Microsoft 365 in Times New Roman 14-point font.

Dated: April 10, 2024 \_\_\_\_\_/s/ Ryan Abbott\_\_\_\_
Ryan Abbott, Esq.

Brown, Neri, Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this brief on counsel of record on April 10, 2024 by CMECF.

Dated: April 10, 2024 \_\_\_\_\_/s/ Ryan Abbott\_\_\_

Ryan Abbott, Esq.

Brown, Neri, Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025

*Attorneys for Plaintiff-Appellant*

**ADDENDUM**

# TABLE OF CONTENTS

**Page(s)**

§101. Definitions..................................................................3a

§201. Ownership Of Copyright...........................................13a

§204(a). Execution Of Transfers Of Copyright Ownership ..............15a

§302(a). Duration Of Copyright: Works Created On Or After January 1, 1978………….………………………………………………………16a

§302(c). Duration Of Copyright: Works Created On Or After January 1, 1978…........................................................................17a

§304. Duration of copyright: Subsisting copyrights .........................18a

\* \* \*

## §101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the

public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is-
    **(1)** the Universal Copyright Convention;
    **(2)** the Geneva Phonograms Convention;
    **(3)** the Berne Convention;
    **(4)** the WTO Agreement;
    **(5)** the WIPO Copyright Treaty;
    **(6)** the WIPO Performances and Phonograms Treaty; and
    **(7)** any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of

viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment,

except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means-

    **(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

    **(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the

sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if-

    **(1)** in the case of a published work, the work is first published-
    **(A)** in the United States;
    **(B)** simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

**(C)** simultaneously in the United States and a foreign nation that is not a treaty party; or

**(D)** in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

**(2)** in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

**(3)** in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is-

**(1)** a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

**(2)** a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include-

**(A)(i)** any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

**(ii)** any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

**(iii)** any portion or part of any item described in clause (i) or (ii);

**(B)** any work made for hire; or

**(C)** any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is-

**(1)** a work prepared by an employee within the scope of his or her employment; or

**(2)** a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared

for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, nor the deletion of the words added by that amendment-

    **(A)** shall be considered or otherwise given any legal significance, or

    **(B)** shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination, by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 2 - COPYRIGHT OWNERSHIP AND TRANSFER

**\* \* \***

## §201. Ownership Of Copyright

**(a)** Initial Ownership. —Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b)** Works Made for Hire. —In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**(c)** Contributions to Collective Works. —Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

**(d)** Transfer of Ownership. —
  **(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

  **(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

**(e)** Involuntary Transfer.—When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
### CHAPTER 2 - COPYRIGHT OWNERSHIP AND TRANSFER

**\* \* \***

## §204(a). Execution Of Transfers Of Copyright Ownership

**(a)** A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

**\* \* \***

## §302(a). Duration Of Copyright: Works Created On Or After January 1, 1978

**(a)** In General. —Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.

**\* \* \***

## §302(c). Duration Of Copyright: Works Created On Or After January 1, 1978

**(c)** Anonymous Works, Pseudonymous Works, and Works Made for Hire. —In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

* * *

## §304. Duration of copyright: Subsisting copyrights

**(a)** Copyrights in Their First Term on January 1, 1978.—(1)(A) Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

**(B)** In the case of—

    **(i)** any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

    **(ii)** any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

**(C)** In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

    **(i)** the author of such work, if the author is still living,

    **(ii)** the widow, widower, or children of the author, if the author is not living,

    **(iii)** the author's executors, if such author, widow, widower, or children are not living, or

    **(iv)** the author's next of kin, in the absence of a will of the author, shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

**(2)(A)** At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

    **(i)** if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or

    **(ii)** if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

**(B)** At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

    **(i)** if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

    **(ii)** if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

**(3)(A)** An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

    **(i)** within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

**(ii)** at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

**(B)** Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

**(4)(A)** If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.

**(B)** If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

**(b)** Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act.—Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.

**(c)** Termination of Transfers and Licenses Covering Extended Renewal Term.—In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

**(1)** In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

**(2)** Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

**(A)** The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

**(B)** The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

**(C)** The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

**(D)** In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor,

administrator, personal representative, or trustee shall own the author's entire termination interest.

**(3)** Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

**(4)** The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

    **(A)** The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

    **(B)** The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

**(5)** Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

**(6)** In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this

subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

**(A)** A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

**(B)** The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

**(C)** Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

**(D)** A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause

(C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

**(E)** Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

**(F)** Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.